**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 24 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

PATRICIA KAYE WOODMAN,

     Plaintiff-Appellant,

v.

MARVIN T. RUNYON,
POSTMASTER GENERAL, and
UNITED STATES POSTAL
SERVICE,

     Defendants-Appellees,

No. 96-4104

---

Appeal from the United States District Court
for the District of Utah
(D.C. No. 92-CV-427)

---

David J. Holdsworth of Romney, Condie & Holdsworth, Salt Lake City, Utah, for
Plaintiff-Appellant.

Carlie Christensen, Assistant United States Attorney (Scott M. Matheson, Jr.,
United States Attorney, with her on the brief), Salt Lake City, Utah, for
Defendants-Appellees.

---

Before **SEYMOUR**, Chief Judge, **McKAY** and **HENRY**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

Patricia Woodman filed a disability discrimination action against the United States Postal Service (USPS) under the Vocational Rehabilitation Act of 1973, 29 U.S.C. §§ 791 and 794, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000 et. seq. The district court granted defendant's motion for summary judgment and denied plaintiff's cross-motion for summary judgment without opinion. At issue in this appeal is Ms. Woodman's allegation that she is a qualified individual with a disability, that the USPS failed reasonably to accommodate her disability by providing her with a permanent job assignment within her medical limitations, and that such failure constitutes discrimination on the basis of disability proscribed by the Rehabilitation Act. For the reasons set forth below, we reverse.

## I.

Patricia Woodman began working for the USPS in Salt Lake City, Utah, in 1981. From the date of her hiring, Ms. Woodman worked in the General Mail Facility (GMF). In January 1985, Ms. Woodman bid into the position of PS-5 distribution clerk at the GMF, where she was responsible for separating incoming and outgoing mail. During her time as a distribution clerk, Ms. Woodman manually sorted letters and later, after training, worked on a multi-position letter sorting machine.

In August 1989, Ms. Woodman sustained an on-the-job injury as a result of her work on the small parcel bundle sorter machine. Her injury was subsequently diagnosed by her treating physician as thoracic outlet syndrome and Ms. Woodman sought compensation and reassignment according to USPS policy and the Federal Employees Compensation Act, 5 U.S.C. §§ 8101 et. seq. Distribution clerks are governed by a collective bargaining agreement between the USPS and the American Postal Workers Union. Article 19 of the collective bargaining agreement incorporates those parts of all USPS handbooks, manuals and published regulations which directly relate to wages, hours, or working conditions. Section 546 of the Employee and Labor Relations Manual governs the USPS injury compensation program and specifically addresses the reassignment of employees injured on the job. Section 546 provides:

> To the extent that there is adequate work available within the employee's work limitation tolerances, within the employee's craft, in the work facility to which the employee is regularly assigned, and during the hours when the employee regularly works, that work constitutes the limited duty to which the employee is assigned.

Aplt. App. at 122-23.

Article 37 of the collective bargaining agreement requires that permanent assignments in the clerk craft be bid for and awarded on the basis of either seniority or qualifications. Assignments to such preferred duty positions without competitive bidding would violate the terms of the collective bargaining

-3-

agreement unless adequate work is not available within the assignee's craft, work facility and work hours consistent with the assignee's medical restrictions. Aplt. App. 123-24.

On October 16, 1989, as a result of her injury, the USPS assigned Ms. Woodman to a limited duty job in the mail processing section of the GMF. Her duties consisted of processing letters by lifting handfuls of ten pounds or less and other miscellaneous duties. In April 1991, Ms. Woodman was diagnosed with carpal tunnel syndrome in her left wrist and arm.[1] Ms. Woodman continued to work in the limited duty job assignment at the GMF until February 1992, when she underwent surgery on her left wrist for treatment of carpal tunnel syndrome.

Following Ms. Woodman's surgery, she was restricted from any use of her left hand. The USPS subsequently assigned her to a temporary limited duty job in "consumer affairs" at the Holladay, Utah, Post Office during the hours of 8:00 a.m. to 5:00 p.m., Monday through Friday. Her duties involved such sedentary and limited-movement tasks as serving as a receptionist, answering phones, doing carrier check-ins, handling accountable mail, and conducting tours of the facility.

---

[1]Ms. Woodman describes the symptoms she experiences from thoracic outlet syndrome and carpel tunnel syndrome as "pain from my neck down to my left hand, fingers. And it's -- at one moment might be my shoulder hurts, it might be my wrist that hurts. It may be my neck that hurts. My hand goes numb. It affects me in everything I do." Ms. Woodman describes the pain as varying from intermittent to "throbbing." Aplee. App. at 76.

Ms. Woodman's treating physician, Dr. George Veasy, approved the job assignment in consumer affairs at the Holladay Post Office and Ms. Woodman accepted it. In March 1992, Ms. Woodman underwent additional testing at the Pioneer Valley Hospital Work Performance Center. Todd Brown, the physical therapist who conducted that testing, advised against returning Ms. Woodman to a job with duties involving repetitive motion.

On November 12, 1992, after Ms. Woodman had achieved maximum improvement as a result of the surgery on her left wrist, the USPS offered her a permanent in-service rehabilitation job assignment as a general clerk in the Patchup-Nixie section at the GMF. The duties consisted of repairing damaged mail and other miscellaneous duties. On November 18, Dr. Veasy approved the job assignment. However, Ms. Woodman's attorney sent a letter to Leo McIssac, Field Director, Human Resources of the Salt Lake City Division of the USPS, expressing several concerns about the Patchup-Nixie job assignment. He pointed out that Dr. Veasy's Work Restriction Evaluation indicated Ms. Woodman's medical condition limited her ability to perform tasks involving simple grasping. The attorney further noted that Ms. Woodman was concerned about how extensively the Patchup-Nixie job would require her to use her left hand and fearful that extensive use of the left side of her body would aggravate both her

carpal tunnel syndrome and her thoracic outlet syndrome.[2]  Ms. Woodman's

attorney concluded by suggesting that she accept the job assignment on a

provisional basis, subject to whether she experienced pain on the job.  In addition,

he requested that the USPS attempt to identify other available jobs that might fit

Ms. Woodman's medical restrictions:

> We also request the Postal Service examine whether there are other jobs which are available at the Main Office (or elsewhere) which would permit Pat to work but which would require only very limited use of her left arm, left shoulder and left side of her body.  If she has no alternative but to accept this job offer and if further injury occurs, we want to know all the considerations which entered into the decision.
>
> . . . .
>
> I would appreciate your review of this situation and the opportunity to discuss the situation with you.

Aplt. App. at 35.  Ms. Woodman accepted the permanent job assignment "subject

to the terms and limitations set forward by my legal representative."  Id. at 37.

On November 28, 1992, Ms. Woodman began work as a clerk in the

Patchup-Nixie section at GMF.  After working in this position for a period of

---

[2]The USPS asserts that the position at Patchup-Nixie was consistent with Ms. Woodman's medical restrictions.  Ms. Woodman contends that the position involved "fine manipulation" which fell outside her medical restrictions.  Ms. Woodman describes her duties at Patchup-Nixie as follows: "You tape together letters that have been ripped up, envelopes that have been ripped up, you take letters that have been damaged and you stick them in little plastic bags and staple them closed."  Aplee. App. at 108.

approximately eleven hours over the course of two days, Ms. Woodman began to experience severe pain and swelling, and sought emergency medical attention at a local emergency care facility. On November 30, Dr. Kathleen Tucker diagnosed Ms. Woodman as suffering from an exacerbation of thoracic outlet syndrome, a cervical strain, and neck spasm. On December 18, Dr. Veasy wrote to the USPS indicating Ms. Woodman had reported that her duties at the Patchup-Nixie job had caused her serious discomfort.[3] He rescinded his previous assertion that the Patchup-Nixie job was consistent with Ms. Woodman's medical restrictions and recommended that she not be assigned to work involving mail processing. Dr. Veasy has since consistently maintained that Ms. Woodman should continue working in light duty assignments.

---

[3]Ms. Woodman outlined the inconsistencies between the duties required of a Patchup-Nixie clerk and her disability:

Q:  What specific duties or what part of that job was it that resulted in your discomfort or your injuries being worsened?
A:  Just doing the job, sitting there and taping a letter together and sticking them in the envelope, that hurt me to do. I mean I can do that two or three times, but you make me do that -- keep doing that all day long --
Q:  So it is the repetitive nature of the job --
A:  Correct
Q:   -- that was the problem for you?
A:  Yes. Richard Gray, I think, told me that I could do it one-handed. I don't know how to tape a ripped up letter together one-handed. I just don't know how that can be done.

Aplee. App. at 108.

Subsequent to Ms. Woodman's failed attempt to perform the Patchup-Nixie job assignment, the USPS reassigned her to the position in consumer affairs. The USPS maintained that the reassignment was temporary pending resolution of Ms. Woodman's medical issues. On September 3, 1993, Ms. Woodman's attorney wrote to counsel for the USPS requesting information as to the status of a permanent assignment for Ms. Woodman and expressing her desire to have the temporary consumer affairs position at the Holladay Post Office converted to a permanent one. Ms. Woodman asserts she received no response to her inquiries until February 1994, at which time Steve Gerber, manager of the Holladay Post Office, informed Ms. Woodman he had received a memorandum from Jerry Jensen, Senior Safety Specialist, Salt Lake City USPS, indicating that Ms. Woodman should return to the Patchup-Nixie job at GMF effective February 12, 1994. In response, Ms. Woodman's counsel sent a letter to Jerry Jenson outlining Ms. Woodman's previous difficulties with the Patchup-Nixie job and stating: "I would hope we ought to be able to share information and all agree before a job offer is made on whether the job would be 'suitable' and consistent with reasonable accommodation." Aplt. App. at 69.

The record reflects that the USPS has accommodated at least one other employee injured on the job by reassigning her to a permanent clerical position after it became apparent the employee could not work in mail processing, even

-8-

though the employee was not qualified for that position in terms of seniority and bid status under the collective bargaining agreement.

On April 13, 1994, Ms. Woodman underwent a functional capacity evaluation to assess her functional capabilities, physical tolerances, and the feasibility of her competitive employment. The physical therapist who conducted the evaluation issued a report finding that Ms. Woodman was capable of performing "at a Work level of SEDENTARY." Aplt. App. at 72. The evaluation also detailed Ms. Woodman's disabilities as revealed by medical testing:

> The pinch strength tested significantly lower in the left hand as compared to the right hand and fell within the low range. During the lifting tests she experienced a marked increase of neck and left arm and shoulder pain. This caused her to alter her body mechanics which prevented safe lifting. She also held her neck rigid throughout.
>
> The bike test to measure her cardiovascular fitness was extremely difficult for her to accomplish. She tested quite low in the poor range. During the mile walk she held herself very rigid and walked very mechanically.
>
> She could not complete the dexterity testing because of pain in the left arm, the results that were obtained indicated low results. During the disassembly of the West Bus Bench her left arm was used sparingly, 95% of the time it hung limply at her side. She did not complete this phase. Assembly of the bus bench requires using the left hand more, she could not complete that portion, and had to quit after 16 minutes because of extreme neck and arm pain. The left hand was darker and bluish in color as compared to the right hand during this testing. Ms. Woodman was in obvious physical distress during and after the evaluation.

Id.

On September 22, 1994, and again on February 5, 1996, the USPS renewed its offer to assign Ms. Woodman to the permanent limited duty job in Patchup-Nixie at the GMF. Ms. Woodman objected to these offers as inconsistent with her medical limitations. The USPS maintains that the limited duty job assignment at GMF is within Ms. Woodman's work limitation tolerances.[4] However, the record contains no evidence that any physical therapist or treating physician has ever approved the Patchup-Nixie assignment as consistent with Ms. Woodman's disabilities after her failed attempt to perform that job assignment in November 1992. As of this date, Ms. Woodman remains in the temporary limited duty job assignment at the Holladay Post Office and continues to receive the full salary of a distribution clerk.

## II.

We review the grant or denial of summary judgment de novo, applying the same legal standard used by the district court pursuant to Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When applying this standard, we

---

[4]Ms. Woodman objects to the permanent job offers in Patchup-Nixie tendered by the USPS because she does not know exactly what the nature of her duties would be: "[O]n the job offers they always say something to the effect and other duties within your medical limitations, so to me things like that are very ambiguous. What are other duties?" Aplee. App. at 92.

examine the factual record and reasonable inferences drawn therefrom in the light most favorable to the party opposing summary judgment.

Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996) (quoting Wolf v. Prudential Ins. Co. of America, 50 F.3d 793, 796 (10th Cir. 1995)).  The nonmovant is generally "given wide berth to prove a factual controversy exists."  Ulissey v. Shvartsman, 61 F.3d 805, 808 (10th Cir. 1995).  "[T]he relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Bingaman v. Kansas City Power & Light Co., 1 F.3d 976, 980 (10th Cir. 1993) (quotation omitted).

Ms. Woodman contends that the USPS, by failing to reassign her to a permanent position within her medical restrictions, engaged in unlawful discrimination based on her disability in violation of the Rehabilitation Act. Section 504(a) provides in relevant part:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be . . . subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by an Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a) (1994).  In addition, section 501(b), which applies only to federal agencies, including the USPS, requires those agencies to "submit to the [Equal Opportunity] Commission and to the Committee an affirmative action

-11-

program plan for the hiring, placement, and advancement of individuals with disabilities in such . . . agency." 29 U.S.C. § 791(b) (1994).[5] For federal employers, therefore, nondiscrimination requires more than mere "equal treatment" of disabled employees and job applicants, and encompasses an affirmative duty to meet the needs of disabled workers and to broaden their employment opportunities. See generally Fedro v. Reno, 21 F.3d 1391, 1398 (7th Cir. 1994) (Rovner, J., dissenting) (citing cases).

Section 501's provision for affirmative action in addition to section 504's prohibition of discrimination against the disabled indicates that federal employers are charged with a greater duty to ensure the employment of disabled workers than are federal grantees or private employers. See Southeastern Community College v. Davis, 442 U.S. 397, 410 (1979) (comparing a federal grantee's duty to accommodate to the greater duty placed upon federal employers under section 501); see also Kathryn W. Tate, The Federal Employer's Duties Under the Rehabilitation Act:  Does Reasonable Accommodation or Affirmative Action Include Reassignment?, 67 TEX. L. REV. 781, 800-803 (1989).[6]  "[T]he EEOC --

_____

[5]For a history of the Rehabilitation Act, see generally Prewitt v. United States Postal Serv., 662 F.2d 292, 301-04 (5th Cir. Unit A, Nov. 5, 1981).

[6]Because of the affirmative action duties placed upon federal employers under section 501, courts should be wary of applying cases interpreting federal grantees' duties of reasonable accommodation under section 504 to cases brought under section 501.  See 67 TEX. L. REV. at 836; Fedro v. Reno, 21 F.3d 1391,

(continued...)

-12-

the agency charged with enforcing section 501 -- has issued a directive providing that 'each agency has a special obligation to provide reasonable accommodation for employees who become disabled and to identify positions within the agency or in other agencies in which the individuals can function in spite of their disabilities.'" Taylor v. Garrett, 820 F. Supp. 933, 936 (E.D. Pa. 1993) (quoting Equal Employment Opportunity Management Directive No. EEO-MD-712, at 9 (Mar. 9, 1983)).  Moreover, the federal government is directed to "become a model employer of individuals with handicaps."  29 C.F.R. § 1614.203(b) (1996).

Neither this nor any other circuit court has established the elements of a prima facie case within the specific context of an action brought against a federal employer under section 501 of the Rehabilitation Act.  However, in Pushkin v. Regents of University of Colorado, 658 F.2d 1372, 1386-87 (10th Cir. 1981), we set out the following test for actions brought under section 504.  In order to qualify for relief, a plaintiff must demonstrate that (1) she is a handicapped person within the meaning of the Act; (2) she is otherwise qualified for the job; and (3) she was discriminated against because of the handicap.  We later adopted this same test for actions brought under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et. seq.  See White v. York Int'l Corp., 45 F.3d 357,

_____

[6](...continued)
1398 (7th Cir. 1994) (Rovner, J., dissenting).

-13-

360-61 (10th Cir. 1995); Hudson v. MCI Telecomm. Corp., 87 F.3d 1167, 1168 (10th Cir. 1996). In Williams v. Widnall, 79 F.3d 1003, 1005 & n.4 (10th Cir. 1996), we analyzed a section 501 claim according to elements (1) and (2) of the White test, but declined to apply element (3) because it was not necessary to our decision in that case. We can discern no reason why the elements of a prima facie case should differ as between sections 501 and 504, although the meaning of "reasonable accommodation," which we will discuss infra, may vary due to the heightened duties ascribed to federal employers under section 501. We therefore adopt the above-stated test for actions brought pursuant to section 501.

The USPS advances several arguments in support of its claim that summary judgment was appropriate in this case. We will treat each one in turn.

A.

The USPS initially argues it was entitled to summary judgment because Ms. Woodman is not a "qualified individual" with a disability and therefore is not protected by the Rehabilitation Act.[7] In determining whether an individual is "qualified" within the meaning of the ADA, this circuit has adopted a two-part analysis:

---

[7]The USPS apparently concedes Ms. Woodman is a "disabled" person within the meaning of the Act in that it argues only that she is not "otherwise qualified."

-14-

First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

White, 45 F.3d at 361-62 (quoting Chandler v. City of Dallas, 2 F.3d 1385, 1393-94 (5th Cir. 1993)). This analysis also applies under section 501 of the Rehabilitation Act.[8] According to the EEOC regulations implementing the

_____

[8]White was decided under the ADA. The ADA, effective July 26, 1992, extended to private employees many of the protections afforded the employees of federal grantees under section 504 of the Rehabilitation Act of 1973. As will be discussed infra, the Rehabilitation Act was amended effective October 29, 1992, to incorporate into sections 501 and 504 the ADA's express provision for reassignment as a potential form of reasonable accommodation. The new addition to section 504 of the Rehabilitation Act states:

The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990, as such sections relate to employment.

29 U.S.C. § 794(d). Section 501 was likewise amended by adding a provision that states:

The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 . . . .

29 U.S.C. § 791(g).

(continued...)

Rehabilitation Act, a "[q]ualified individual with handicaps" is:

> an individual with handicaps who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others and who . . . [m]eets the experience or education requirements . . . of the position in question.

29 C.F.R. § 1614.203(a)(6) (1996).

By definition, whether an individual is "qualified" turns on whether that person can reasonably be accommodated to perform the job in question. There has been considerable debate as to whether the duty to provide reasonable accommodation under the Rehabilitation Act includes a duty to reassign a disabled employee to another job.[9] In 1992, Congress eradicated this confusion

---

[8](...continued)
Cases decided under section 504 of the Rehabilitation Act are therefore applicable to cases brought under the ADA and vice versa, except to the extent the ADA expressly states otherwise. See 29 C.F.R. pt. 1630, App. 1630 ("Unless expressly stated otherwise, the standards applied in the ADA are not intended to be lesser than the standards applied under the Rehabilitation Act of 1973.") The same is true of section 501 in some instances. However, as we have already discussed and will discuss further infra, section 501 of the Rehabilitation Act applies only to federal employers, imposes affirmative action duties, and may therefore entail heightened duties of "reasonable accommodation" not applicable to private employers under the ADA.

[9]A majority of courts have held that reassignment was not required as a form of reasonable accommodation under the pre-1992 Act. See, e.g., Fedro, 21 F.3d at 1395 (citing cases). There has been considerable dissent on this point, however, largely based on the argument that decisions finding no duty to reassign did not take adequate account of the heightened duties federal employers must carry out under section 501. See id. at 1398-1400 (Rovner, J., dissenting); 67 TEX. L. REV. at 800-803.

by amending the Act to include reassignment as a possible reasonable accommodation. See 29 U.S.C. §§ 791(g), 794(d) (incorporating standards of ADA into Rehabilitation Act); 42 U.S.C. § 12111(9) (under ADA, "The term 'reasonable accommodation' may include -- .assignment to a vacant position"); see also supra note 8. The regulations were likewise amended in October 1992, to provide in relevant part:

> (g) *Reassignment*. When a nonprobationary employee <u>becomes unable to perform the essential functions of his or her position even with reasonable accommodation due to a handicap, an agency shall offer to reassign the individual to a funded vacant position</u> located in the same commuting area and serviced by the same appointing authority, and at the same grade or level, the essential functions of which the individual would be able to perform with reasonable accommodation if necessary unless the agency can demonstrate that the reassignment would impose an undue hardship on the operation of its program. In the absence of a position at the same grade or level, an offer of reassignment to a vacant position at the highest available grade or level below the employee's current grade or level shall be required . . . .

29 C.F.R. § 1614.203(g) (1996) (emphasis added).

At least subsequent to the 1992 amendments, the EEOC's use of the term "position in question" as part of its definition of "qualified" in § 1614.203(a)(6) requires clarification. Section 1614.203(g) of the regulations explicitly states that an agency must offer reassignment to a vacant position to employees who, because of a handicap, no longer are able to perform the essential functions of their position, even with reasonable accommodation -- i.e., individuals who

-17-

concede that they are not qualified for their original positions. To interpret "position in question" to refer only to plaintiff's qualifications for the original position, then, would render § 1614.203(g) meaningless. Requiring that plaintiffs demonstrate they are capable of performing their original job would disqualify the very individuals the regulation is intended to benefit. We think it obvious that "position in question" cannot be read so narrowly and remain consistent with the reassignment requirement.

Further, although a majority of courts have held that no *statutory* duty to attempt reassignment existed prior to 1992, it has long been the law that a federal employer "cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies." School Bd. v. Arline, 480 U.S. 273, 289 n.19 (1987); see Rhone v. United States Dep't of the Army, 665 F. Supp. 734, 744 (E.D. Mo. 1987) (employer required by Rehabilitation Act to consider reassignment where OPM handbook and demonstrated practice expressed policy favoring reassignment of disabled employees). A restrictive reading of "position in question" is therefore similarly illogical when the employer's duty to reassign emanates from its own policies or customs. See Taylor, 820 F. Supp. at 938 (availability of reassignment as a possible reasonable accommodation "casts doubt on the limited, retrospective definition of the phrase 'position in question' urged by [the defendant]" prior to

1992 amendments).

Indeed, we have recently made clear that whether a person is "qualified" under the amended Rehabilitation Act and the corresponding EEOC regulations entails a modified version of the two-step inquiry that examines, if necessary, the availability of other jobs the plaintiff might do:

> To determine if a person with a disability is "otherwise qualified" for employment, we look to whether or not a reasonable accommodation would enable the person to perform the job. There are two components to the reasonable accommodation analysis. *First*, whether a reasonable accommodation would enable the employee to do the particular job. Additional training might be a reasonable accommodation for this purpose. *Second*, whether the employee could be transferred to other work which could be done with or without accommodation.

Gonzagowski v. Widnall, 115 F.3d 744, 747 (10th Cir. 1997) (citing White, 45 F.3d at 360).

Thus, the relevant inquiry in determining whether an employee is "qualified" under the amended Act for purposes of a motion for summary judgment is whether the employee has provided evidence that she can be reasonably accommodated -- which includes reasonable reassignment -- sufficient to require submission to a jury.[10] The USPS asserts that since Ms. Woodman was

---

[10]We believe this approach is consistent with that applied by other courts considering whether a plaintiff has demonstrated he is "otherwise qualified" in the context of either a statutory or other duty to consider reassignment. For example, in Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996), a post-1992

(continued...)

hired as a distribution clerk, and since it is undisputed she can no longer perform the "essential functions" of a distribution clerk's job, she is not "qualified" for the "position in question" and is therefore not entitled to accommodation by the USPS. In light of the foregoing analysis, the USPS's claim depends entirely upon whether it had a duty to attempt to reassign Ms. Woodman either because the 1992 amendments are applicable to this case, or because USPS had an existing policy of reassigning disabled workers, the question to which we now turn.

B.

The USPS contends the 1992 amendments do not apply here because all the instances of discrimination alleged by Ms. Woodman occurred prior to the

---

[10](...continued) amendments case, the Third Circuit determined that the plaintiff had not demonstrated he was "otherwise qualified" for the position he held prior to being terminated by USPS. However, it then held that the district court had erred in failing to consider whether the plaintiff had demonstrated there were other jobs available for which he was qualified and to which he could be reassigned. The court explicitly stated: "[C]ourts should consider whether reassignment is possible in determining whether an individual seeking relief under the Rehabilitation Act is an otherwise qualified individual." Id. at 832.

Courts have also taken this approach where the duty to consider reassignment emanates from application of an agency's already-existing policy. In Taylor, the court noted that the Navy's contention that the plaintiff was not qualified to perform the job for which he was originally hired "presupposes that it had no obligation under the Rehabilitation Act to transfer [plaintiff], once he proved unable to perform his original job, to another suitable, permanent position within the agency or to reclassify him within his medical restrictions." 820 F. Supp. at 936.

October 29, 1992, effective date. We disagree. The central issue in this case is whether the USPS discriminated against Ms. Woodman by assigning her in November 1992 (one month *after* the effective date of the amendment) to a position she contends is not consistent with her medical restrictions and by failing to assign her to a permanent position that does meet her capabilities. Ms. Woodman is currently requesting only injunctive relief in the form of a permanent job assignment within her medical restrictions and reasonable attorneys' fees. Although Ms. Woodman filed this action in May 1992 based in part on the USPS's alleged failure to assign her to a permanent position within her medical restrictions prior to that time,[11] she amended her complaint in December 1992 to include the dispute over the Patchup-Nixie job assignment. Moreover, the district court's pre-trial order entered in November 1995 lists all of Ms. Woodman's post-October 1992 claims as disputed issues in this litigation. Whether or not the USPS had a duty based on its existing policies to attempt to reassign Ms. Woodman as part of its duty to provide her reasonable accommodation prior to October 1992, it most certainly does now under the 1992 amendments.

Nonetheless, we must also consider whether plaintiff complied with the statutory requirement that she exhaust her administrative remedies before seeking

---

[11]Ms. Woodman also alleged various claims under a hostile environment theory she has since abandoned.

relief in federal court as to the claims arising after the filing of her initial complaint. "'[E]xhaustion of administrative remedies is a jurisdictional prerequisite' to instituting a Title VII action in federal court." See Khader v. Aspin, 1 F.3d 968, 970 (10th Cir. 1993) (quoting Johnson v. Orr, 747 F.2d 1352, 1356 (10th Cir. 1984)). The Rehabilitation Act encompasses this exhaustion requirement. Id. at 971 & n.3; see also Johnson, 747 F.2d at 1356-57.

Ms. Woodman filed her final EEO complaint with the USPS in April 1992. The final agency decision was issued on June 22, 1992. Although these complaints were filed and disposed of prior to both the effective date of the 1992 amendments and the beginning of the present dispute over the Patchup-Nixie permanent job assignment, Ms. Woodman maintains we should consider her post-October 1992 claims exhausted under a "continuing violation theory." In support of this position, she cites our decision in Brown v. Hartshorne Pub. Sch. Dist., 864 F.2d 680 (10th Cir. 1988), in which we held that discriminatory acts arising during the pendency of an EEOC complaint were properly before the court even though not formally presented to the agency. Id. at 682. In doing so, we agreed with numerous other courts holding that a "'judicial complaint . . . may encompass any discrimination like or reasonably related to the allegations'" in the administrative charge, and that "acts committed pursuant to a pattern of discrimination . . . are reasonably related to that complaint." Id. (quoting

Oubichon v. North Am. Rockwell Corp., 482 F.2d 569, 571 (9th Cir. 1973)).

Although the discriminatory acts asserted post-filing (the failure by the USPS to reassign plaintiff to a suitable permanent position) are clearly part of an alleged pattern of continuing behavior, we are presented here with a case in which a change in the law has occurred that arguably gives those facts a different meaning than they had when the administrative agency considered the claim. Even so, we hold that Ms. Woodman's claims under the 1992 amendment were properly before the district court. The twofold purpose of the exhaustion requirement is to give notice of an alleged violation to the charged party and to give the administrative agency an opportunity to conciliate the claim in furtherance of Title VII's goal of securing voluntary compliance. See Ingels v. Thiokol Corp., 42 F.3d 616, 625 (10th Cir. 1994). In this case, Ms. Woodman complied in good faith with the exhaustion requirement as to her pre-October 1992 claims. See Khader, 1 F.3d at 971 ("Good faith effort by the employee to cooperate with the agency and the EEOC and to provide all relevant, available information is all that exhaustion requires."). The new law went into effect after her claims were already pending in federal court and she thus could not have raised them before the administrative agency. To force her to suspend her case and return to the administrative process in order to obtain the benefit of the new law would cause unnecessary bifurcation of her claims and frustration of the

principles of judicial economy.[12]   See Oubichon, 482 F.2d at 571.

We therefore hold that the 1992 amendments to the Rehabilitation Act apply to all of Ms. Woodman's claims arising after October 1992, and that those claims were properly before the district court.  Moreover, Ms. Woodman has provided evidence sufficient to raise an issue of fact as to whether the USPS had a duty to reassign her pursuant to its existing policies pertaining to workers injured on the job as defined by USPS.  Because the USPS had a duty to consider reassignment as a possible accommodation, its assertion that summary judgment was proper on the ground that Ms. Woodman was not a qualified individual within the meaning of the Rehabilitation Act due to her inability to perform her previous job must fail.

## C.

The USPS next asserts it should be granted summary judgment on the ground that Ms. Woodman failed to meet her burden to demonstrate that

---

[12]We note that this is an unusual case.  Although Ms. Woodman contended initially that the USPS was under a legal duty to attempt to reassign her under the Rehabilitation Act even prior to October 1992 because it had an existing policy to do so, she now asserts that the only issues before this court concern events that occurred after October 1992. ("[A]ll of the events at issue in this lawsuit . . . , occurred after the date the 1992 amendments went into effect.  The USPS did not promulgate its limited duty job offer until after October 1992, beginning in November 1992.  These events post October 1992, are the focus of Pat Woodman's claims."  Aplt. Repl. Br. at 13-14).

reasonable accommodation of her disability was possible. The USPS urges that reassignment is required only where there exists a "funded vacant position located in the same commuting area and serviced by the same appointing authority, and at the same grade or level," 29 C.F.R. §1614.203(g), and that it is solely plaintiff's duty to identify the jobs for which she would be eligible. The USPS cites several federal cases for this proposition, including two of our own decisions construing the various burdens of production and persuasion under the ADA. See Milton v. Scrivner, Inc., 53 F.3d 1118, 1125 (10th Cir. 1995); White, 45 F.3d 357. USPS further contends a plaintiff must demonstrate that reasonable accommodation through reassignment is possible prior to invoking any duty on the part of the employer to assist her in this process. In doing so, USPS again cites White, where we stated that "the interactive process is triggered only if the employee is 'qualified,' . . . and the term 'qualified' is designed to include the concept of reasonable accommodation." White, 45 F.3d at 363.

Because this circuit has never squarely addressed the issue and because there is considerable division among the circuits that have done so, we will first clarify the burden of proof plaintiffs and defendants must meet in order to survive summary judgment under the Rehabilitation Act. In doing so, we emphasize once again that this case involves a discrimination claim brought by a federal employee against a federal agency under section 501 of the Rehabilitation Act. It is well

-25-

established both by the statutory language and Supreme Court decisions interpreting the Act that federal employers have greater duties to accommodate disabled workers under section 501 than the duties owed by federal grantees under section 504 or those owed by employers under the ADA. We keep this heightened duty in the foreground when fleshing out a plaintiff's and defendant's respective burdens under section 501.[13]

Courts have encountered considerable difficulty in allocating the burdens of persuasion and production under the Rehabilitation Act. Of course, the ultimate burden of proving unlawful discrimination rests with the plaintiff. See White, 45 F.3d at 361. However, the defendant employer is also obligated to demonstrate it has complied with the various statutory duties placed upon it, most especially the duty to provide reasonable accommodation. See Shiring v. Runyon, 90 F.3d 827,

_____

[13]The EEOC, the agency charged with promulgating regulations and otherwise enforcing the Rehabilitation Act, has elaborated the breadth of the duties accorded federal employers under section 501:

> [I]t is important to consider both the legislative history and Congressional mandates of the Rehabilitation Act on [f]ederal agencies. The legislative history of the Rehabilitation Act shows that Congress expected and fully intended that the [f]ederal government was to be a model employer of the handicapped, taking affirmative action to hire and promote the disabled.

Ignacio v. United States Postal Serv., Pet. No. 03840005, Fed. Equal Opportunity Rptr. ¶ 843159, at XII-84-264 (EEOC Sept. 4, 1984), quoted in Fedro, 21 F.3d at 1399 (Rovner, J., dissenting) (citations omitted).

831-32 (3d Cir. 1996).  Further muddying the waters is the unfortunate fact that "reasonable accommodation" is an element that must be addressed by *both* the plaintiff (as part of a showing that she is "qualified") and by the defendant (who must demonstrate that reasonable accommodation is not possible).  See Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 136 (2d Cir. 1995) ("Given the rather obscure regulatory language," it is not surprising that courts "have found the assignment of the burdens of production and persuasion particularly difficult as to reasonable accommodation."); 29 C.F.R. § 1614.203(g) (1996) ("[A]n agency shall offer to reassign the individual . . . unless the agency can demonstrate that the reassignment would impose an undue hardship on the operation of its program.") (emphasis added); 29 C.F.R. § 1613.702(f) (1991) ("[q]ualified handicapped person" is one who, "with or without reasonable accommodation, can perform the essential functions of the position in question") (emphasis added).

At least one of the circuits considering this issue has placed both the burden of production and persuasion on the plaintiff.  In Barth v. Gelb, 2 F.3d 1180, 1186-87 (D.C. Cir. 1993), the court held that a plaintiff must demonstrate both that a given accommodation would allow him to perform the essential elements of the job and that the accommodation would be reasonable "in the run of cases."  The court further held, however, that an employer who invokes the

-27-

affirmative defense of undue hardship bears the burden of proof on that issue.  Id. at 1186-87.  See also Carr v. Reno, 23 F.3d 525, 529 (D.C. Cir. 1994).  The Fifth and the Ninth Circuits have taken exactly the opposite approach, placing the initial burden on the employer to demonstrate that the plaintiff cannot reasonably be accommodated.  See Mantolete v. Bolger, 767 F.2d 1416, 1423-24 (9th Cir. 1985); Prewitt v. United States Postal Serv., 662 F.2d 292, 308 (5th Cir. Unit A Nov. 5, 1981).

The Second Circuit, in a helpful discussion of the issue, has observed that the D.C. Circuit's position fails to account for those cases in which an accommodation that would be unreasonable for most employers could be required in the particular circumstances.  Borkowski, 63 F.3d at 137.  The approach of the D.C. Circuit also overlooks the fact that "the employer has far greater access to information than the typical plaintiff, both about its own organization, and equally importantly, about the practices and structure of the industry as a whole."  Id. The Second Circuit also identified problems with the position taken by the Fifth and Ninth Circuits, however, pointing out that those courts in effect 'put[] on the employer the burden of demonstrating that the plaintiff is not otherwise qualified for employment."  Id.  The Second Circuit therefore urges adherence to a "middle course" that will place burdens on both parties in keeping with the intended purposes of the Rehabilitation Act and in recognition of the types of information

-28-

each party is most likely to be in the best position to produce. Id. at 137-38.

We agree with the Second Circuit and hold that a plaintiff bears the ultimate burden of proving she is "qualified" within the meaning of the Rehabilitation Act, i.e., that there are jobs available that her disability will nevertheless allow her to do, with or without reasonable accommodation. However, a plaintiff's burden with respect to the plausibility of reasonable accommodation is one of production only. In accordance with section 501 of the Rehabilitation Act's mandate that federal employers act affirmatively to provide reasonable accommodation for disabled workers, this burden of production "is not a heavy one. It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." Borkowski, 63 F.3d at 138 (citation omitted). Once the plaintiff has made this facial showing that accommodation is possible, the burden shifts to the defendant to prove that accommodating the plaintiff would pose an undue hardship. Id.

We are convinced that placing the burden of locating other available jobs entirely on the plaintiff would be inconsistent both with the implementing regulations of the 1992 amendments and with the affirmative action duties contemplated by section 501, the latter of which do not apply to private employers under the Americans with Disabilities Act, the statute controlling our decision in

White.[14]   The duties of reasonable accommodation under section 501 and the duty to reassign under the 1992 amendments are mandates with which federal employers are obligated to comply.  Federal employers therefore must play a considerable role in ensuring that every reasonable effort is made to find suitable jobs for disabled employees.  Without question, employees must come forward with that information they are best placed to know -- the fact and nature of their disability and their wish to be accommodated.  In other words, employers are not required to *initiate the inquiry* into whether a given employee with a disability can be accommodated.  See Gilbert v. Frank, 949 F.2d 637, 642 (2d Cir. 1991) (holding that while employer does not have the initial burden of raising the issue of accommodation, once the employee has done so, "in light of the goals of the Rehabilitation Act and the greater access of the employer to information regarding the feasibility of various possible job modifications, the employer is

---

[14]The factors that must be considered in determining what is "reasonable" obviously differ as between federal and private employers.  See, e.g., Lex K. Larson, Employment Discrimination § T106.44(a) (2d ed. 1997) ("'Reasonable accommodation' in federal employment does not raise the same issues as it does, say, under §504.  There is little to stop the federal government from expending considerable money and effort to become a model employer of handicapped individuals, when that is its chosen policy."); see also Mantolete v. Bolger, 767 F.2d 1416, 1425 (9th Cir. 1985) (Rafeedie, District J., concurring) (demanding burdens placed on federal employers to seek means of accommodation are "justified in light of the express language of § 501 and its implementing regulations. . . . Certainly it is hoped that private employers will follow the government's lead, but it is debatable whether Congress meant to impose equivalent obligations.").

-30-

given the ultimate burden of proof on the issue of reasonable accommodation").

Nevertheless, we agree with those courts concluding that realizing the goals of the Rehabilitation Act requires an "interactive process" whereby federal employers investigate in good faith the availability of positions to which disabled employees could be reassigned, a task that employers are far better placed to do than are employees, and that they must do under the Act. See id.; Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1113 (8th Cir. 1995) (pointing out that although plaintiff retains ultimate burden of proof on his ability to perform the essential functions of the job, with or without accommodation, "much of the information which determines those essential functions lies uniquely with the employer"). We find persuasive the Ninth Circuit's interpretation of the employer's duties under the Rehabilitation Act once an employee has identified the nature of her disability and requested accommodation:

> An employer, to meet its burden under the Act, may not merely speculate that a suggested accommodation is not feasible. When accommodation is required to enable the employee to perform the essential functions of the job, the employer has a duty to 'gather sufficient information from the applicant and qualified experts as needed to determine what accommodations are necessary to enable the applicant to perform the job . . . .'

Buckingham v. United States, 998 F.2d 735, 740 (9th Cir. 1993).

Common sense dictates that an employee need not identify an available position for reassignment prior to enlisting the employer's assistance. In order to

-31-

initiate the interactive process, it is enough for a plaintiff to notify the employer of the nature of her disability and specifically request information about possible reassignment. At that point, the employer is obliged to assist her in the effort to identify an available job.[15] See Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997) ("[W]e do not suggest that the employee has the burden of identifying an open position before the employer's duty of accommodation is triggered. In many cases, an employee will not have the ability or resources to identify a vacant position absent participation by the employer.");[16] Taylor v. Principal Fin. Group,

---

[15]We recognize that employees may acquire other duties as the interactive process unfolds. For example, it may be necessary for an employee to undergo medical and other forms of testing in order to assist the employer in determining the extent of her disability and in identifying jobs consistent with her capabilities.

[16]One of the key cases cited by the USPS for the proposition that it is Ms. Woodman's burden to identify a position suitable for reassignment is the Third Circuit's decision in Shiring v. Runyon, 90 F.3d 827 (3d Cir. 1996). Shiring states in relevant part: "When the employee contends that he would be otherwise qualified with reasonable accommodation, it falls to the employee to make at least a facial showing that reasonable accommodation is possible. . . . Shiring would have to demonstrate that there were vacant, funded positions whose essential duties he was capable of performing, with or without reasonable accommodation . . ." Id. at 832. Subsequently, however, in Mengine, 114 F.3d at 420, the Third Circuit specifically discussed Shiring and went on to make clear that before this duty arises, an employee is entitled to enlist the federal employer's assistance in identifying a position and that the employer is obliged to provide the assistance.

Further support for our construction of a federal employer's burden in the process of identifying a reasonable accommodation comes from the Interpretive Guidance on Title I of the Americans with Disabilities Act, which provides the following:

> *Once a qualified individual with a disability has requested provision of a reasonable accommodation*, the employer must make a

(continued...)

Inc., 93 F.3d 155, 165 (5th Cir. 1996) (The "employee's initial request for an accommodation . . . triggers the employer's obligation to participate in the interactive process."); Beck v. University of Wisconsin Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996) (employer bears some responsibility in determining the necessary accommodation).

In this case, Ms. Woodman has requested reasonable accommodation and has also made a facial showing that reasonable accommodation through permanent reassignment is plausible. In addition to Ms. Woodman's admittedly disputed contention that the consumer affairs job she has held and performed without difficulty since 1992 could become her permanent job, Ms. Woodman has repeatedly and specifically requested that the USPS assist her in locating other jobs she might do. Moreover, she has undergone several arduous functional capacity evaluations in order to determine the extent of her physical limitations and capabilities, often causing herself significant physical pain in the process. The USPS was thus obliged to investigate the possibility of permanent

[16](...continued)
reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability.

29 C.F.R. Pt. 1630, App. § 1630.9 (1996). (emphasis added). The Interpretive Guidance then describes how an employer and employee might together identify accommodations that are not immediately obvious. See id.

reassignment by gathering necessary information from Ms. Woodman concerning her medical condition and searching for available permanent jobs.

The USPS asserts it has met its obligations under the Rehabilitation Act by assigning Ms. Woodman to the Patchup-Nixie position. However, Ms. Woodman has vigorously contested the assertion that the Patchup-Nixie job meets her medical restrictions. In light of the evidence in the record concerning Ms. Woodman's medical restrictions and her previous inability to perform this job, the USPS's conclusory assertion that the assignment is within her medical restrictions is a disputed question of fact that must be resolved at trial. See Tuck v. HCA Health Servs. of Tennessee, Inc., 7 F.3d 465, 471-72 (6th Cir. 1993) ("[F]act-specific inquiry 'should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved.'" (quoting Hall v. United States Postal Serv., 857 F.2d 1073, 1079 (6th Cir. 1988)). Consequently, the district court erred in granting summary judgment to the USPS.

D.

We address briefly the USPS's assertions that assigning Ms. Woodman to a permanent position in consumer affairs would be unreasonable as a matter of law. Because we hold there is a question of fact as to whether the USPS has done

-34-

everything reasonably possible to assist Ms. Woodman in locating a permanent position within her medical restrictions apart from the position in consumer affairs, resolution of this question in the USPS's favor would not dispose of the entire case. Since we do not know on what basis the district court granted summary judgment, however, we consider this question for the purpose of determining whether Ms. Woodman's assertion that she could reasonably be accommodated by a permanent assignment to consumer affairs remains an issue to be placed before the factfinder on remand.

USPS first asserts as a matter of law that it need not permanently assign Ms. Woodman to consumer affairs because reassignment is required only where there exists a "funded vacant position located in the same commuting area and serviced by the same appointing authority, and at the same grade or level." 29 C.F.R. § 1614.203(g) (1996). USPS further contends that the consumer affairs job Ms. Woodman now performs is, in fact, "nonexistent" because it was created solely as a temporary measure to provide Ms. Woodman with some work duties while awaiting reassignment elsewhere.

It is well established in the case law that regardless of any explicit statutory duty to reassign, a federal employer "cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies." Arline, 480 U.S. at 289 n.19. Ms. Woodman has demonstrated a

-35-

factual dispute on this point by providing evidence that USPS has accommodated another employee in a situation similar to her own by assigning her to a permanent position in consumer affairs.  See  Leslie v. St. Vincent New Hope, Inc., 916 F. Supp. 879, 887-88 (S.D. Ind. 1996) (where department routinely grants transfers between facilities it is required to do so as reasonable accommodation under the Rehabilitation Act); Hurley-Bardige v. Brown, 900 F. Supp. 567, 571 (D. Mass. 1995) (same); Howell v. Michelin Tire Corp., 869 F. Supp. 1488, 1492-93 (M.D. Ala. 1994) (question of fact existed as to whether employer had previously reassigned other employees in similar situation as plaintiff).

The USPS next contends as a matter of law that it need not reassign Ms. Woodman to the position in consumer affairs because to do so would violate the terms of the collective bargaining agreement between the USPS and the American Postal Workers Union.  The USPS cites the large body of case law holding that the Rehabilitation Act does not require federal employers to accommodate disabled employees in such a way as to usurp the legitimate rights of other employees under the terms of a collective bargaining agreement.  See, e.g., Milton v. Scrivner, 53 F.3d 1118, 1125 (10th Cir. 1995); Daubert v. United States Postal Serv., 733 F.2d 1367, 1370 (10th Cir. 1984).   Indeed, the 1992 revisions of the implementing regulations expressly provide:

> For the purpose of this paragraph [discussing reassignment as an accommodation], an employee of the United States Postal Service shall not be considered qualified for any offer of reassignment that would be inconsistent with the terms of any applicable collective bargaining agreement.

29 C.F.R. § 1614.203(g). The USPS argues that it is not required to assign Ms. Woodman to a permanent position in consumer affairs because such a position is classified as a "preferred duty assignment" that must be filled through a bidding process based on seniority and qualifications pursuant to the collective bargaining agreement. Aplee. Br. at 24.

We need not define the outer limits of a valid collective bargaining agreement under the Rehabilitation Act for purposes of our decision in this case because the agreement at issue does not by its terms bar reassignment to a position in consumer affairs. The USPS contends it has offered unrebutted evidence that Article 37 of the collective bargaining agreement prohibits Ms. Woodman's permanent reassignment to the position she now holds. The USPS correctly asserts that Article 37 requires that preferred duty assignments be bid for, but it fails to note the declaration of its own Labor Relations Specialist that this requirement applies only where there is "adequate work available within the plaintiff's craft, work facility and work hours consistent with her medical restrictions." Aplt. App. at 123-24. Where reassignment is not *expressly* prohibited by the collective bargaining agreement, such reassignment does not

-37-

constitute a per se contravention of the rights of other employees and does not justify a grant of summary judgment. See Buckingham v. United States, 998 F.2d 735, 741-42 (9th Cir. 1993). Thus, there remain disputed issues of fact regarding whether Ms. Woodman could be reasonably accommodated with a position in consumer affairs.

### III.

This case clearly presents genuine issues of material fact precluding judgment as a matter of law. We therefore **REVERSE** the district court's grant of summary judgment to the USPS and **REMAND** for further proceedings consistent with this opinion.