**Robert T. MAWSON, Plaintiff,**

v.

**U S WEST BUSINESS RESOURCES, INC., a Colorado corporation, Defendant.**

**Civil Action No. 96–K–1378.**

United States District Court, D. Colorado.

Oct. 22, 1998.

Marc P. Mishkin, Denver, CO, Ronald E. Gregson, Denver, CO, for Plaintiff.

Thomas M. Pierce, U.S. West Law Department, Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

Plaintiff, a white male who had been treated for a heart condition and bipolar affective disorder at the time he was terminated from his employment with Defendant in 1994, brings this action under Title VII and the Americans with Disabilities Act. The stated reasons for Plaintiff's termination were that Plaintiff had been disciplined repeatedly for engaging in inappropriate and sexually suggestive behavior and had violated the company's code of ethics and conduct. Plaintiff asserts these reasons were pretextual, and asserts it was he who was sexually harassed in the workplace and retaliated against for complaining about it. Plaintiff claims the harassment of coworkers intensified his physical and mental disabilities which Defendant, by failing to put an end to the harassment, failed reasonably to accommodate.

Based on these allegations, Plaintiff asserts claims for disability discrimination under Title II of the Americans with Disabilities Act (the ADA), 42 U.S.C. § 12112(b), and for sexual harassment/hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e–3. Plaintiff seeks compensatory and punitive damages under each of his three theories of relief.

In separate motions, Defendant U.S. West Business Resources, Inc. (BRI) asserts it is entitled to summary judgment on each of Plaintiff's claims. BRI asserts Plaintiff has failed to come forward with sufficient evidence to create triable issues on multiple elements of his ADA claims and has failed to establish a *prima facie* case of discrimination. BRI also asserts Plaintiff's Title VII claims should be dismissed for lack of subject matter jurisdiction because Plaintiff's administrative charge related solely to his disability discrimination claims and cannot be said to relate reasonably to any claim for sexual harassment or hostile environment. I agree with BRI on both counts and order that summary judgment enter in favor of Defendant and against Plaintiff on each of Plaintiff's several claims for relief.

## I. SUMMARY JUDGMENT STANDARD.

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the burden of showing no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue of fact is material if it is essential to the claim under the governing substantive law. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must draw all reasonable inferences from the factual record in favor of the party opposing summary judgment. *Id.* at 670 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). There is no genuine issue of material fact if no reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The purpose of a summary judgment motion is to determine whether a trial in a particular case is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). To avoid summary judgment, the nonmoving party therefore must refer to specific facts, beyond those in the pleadings, and demonstrate the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *White* at 360. Bald allegations without "significant probative evidence" to support them are insufficient, *White* at 360, as are

conclusory assertions that factual disputes exist. *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505.

## II. *FACTS.*

Plaintiff Robert T. Mawson began working for the corporate predecessor of U.S. West Communications, Inc. ("US West") in August, 1979. He held several different jobs at U.S. West, including operator, purchasing agent and human resources. His performance was satisfactory (Mawson Dep. 28:1–10), and he received promotions and pay increases in accordance with a union contract. (*Id.* at 26–28). Mawson was a member of the Communications Workers of America, AFL—CIO (CWA) and was a union steward. (First Am.Compl., ¶ 22; Mawson Dep. 28–29). Mawson requested and obtained a transfer to BRI's National Traffic Center in 1993, where he worked until his termination on June 28, 1994. (Mawson Dep. at 28–29; Def.'s First Br.Ex. S.)

In December 1989 Mawson was diagnosed with bipolar disorder and manic depression and took a three-and-one-half month disability leave. (Mawson Affid., Pl.'s Ex. 2, at 7.) During his leave and then regularly thereafter, Mawson met with U.S. West Professional Health Services counselor Steven McCeney. (*See* McCeney clinical notes from 2/1/90 through 11/19/91, Pl.'s Ex. 11.) These clinical notes and notes from meetings between McCeney, Mawson and U.S. West management became part of Mawson's Health Services chart, but were not incorporated into his personnel records. *Id.*

McCeney's notes from early 1990 indicate Mawson was out "for bronchitis" as well as his manic depression. (Pl.Ex.11, No. 1455.) Mawson's manic depression was treated by Dr. Alan Levine, who prescribed lithium and later Prozac. (*Id.,* No. 1455.) On February 27, U.S. West manager Chris Dimas met with McCeney to discuss Mawson's upcoming return to work. Dimas expressed concerns about Mawson's "work ethic" and otherwise unexplained "threatening outbursts" and stated she intended to place him on "benchmarks" when he came back. (Pl.'s Ex. 11, no. 1453.) According to Mawson, being placed on "benchmarks" meant working from a written list of specific tasks under continuous management supervision. (Maw-

son Affid. at pp. 7–8.) McCeney conducted a follow-up meeting on March 5, 1990, with Mawson, Dimas and Mawson's immediate supervisor, Linda Talavera, to discuss changes that had taken place in the company during his absence and to address Mawson's concerns about the perceptions of coworkers and his supervisors' expectations upon his return. (Ex. 11 at 1450–51.) Mawson returned to work the next day.

Mawson received a verbal reprimand in November 1990 after a coworker complained about what she perceived to be an off-color comment Mawson had made in her presence as a technician was installing a new phone line in her work area. Five months later, in April 1991, Mawson's supervisor, Gil Matamoros received a memorandum from another female employee who had been referred to Mawson for candidate testing when he was assigned to the Human Resources Department. *See* 4/3/91 Mem. from W. Morgan to G. Matamoros (Def.'s Ex. F). The employee complained of comments Mawson had made that made her "uncomfortable," including statements, in reference to her hair color, that he "preferred redheads" and found them "a bit on the wild side." *Id.* He approached her twice for lunch and, when she told him she was married, stated they "could get in a lot of trouble" and that he would try "not to bite [her] neck" and to "keep his hands to himself." With respect to the testing, the employee stated she perceived Mawson to be suggesting he "would work it out, 'if you play my game, I'll play yours.' " *Id.* at p. 2. She described the interaction with Mawson as "frightening." *Id.*

The matter was investigated and a disciplinary meeting convened with Mawson, Dimas and Matamoros. In handwritten notes from the April 15 meeting, Mawson was found to have "used poor judgment and inappropriate behavior" which was "not acceptable nor will be tolerated." (Def.'s Ex. G). Also noted was Mawson's "unsatisfactory range of attendance" such that "one more incidental absence can lead to dismissal." In addition, Mawson was admonished to conduct himself within the company's professional guidelines, to cease offering employees "special favors," attend "pluralism" training, be suspended without pay for period of time he was not in his office, and "place[d] on final

warning of dismissal for indefinite period of time." *Id.* Mawson signed the meeting notes, and signed a separate document which memorialized the November 1990 incident and verbal reprimand. (Ex. E).

In further acknowledgment of the disciplinary act taken, Mawson hand-wrote and signed a memorandum entitled "My Committment [sic] Regarding my Continued Employment With U.S. WEST Communications." (Mawson Dep. 336 – 337; Def.'s Ex. H.) In the memorandum, Mawson committed to refrain from representing to employees or others that he had "the ability to grant favors or influence their chances of employment or transfer," to avoid showing "bias or favoritism," to "present myself in the most professional manner I know how, and to accept the disciplinary action taken" "as an indicator of improper behavior." With regard to his health and attendance, Mawson committed to "keep doctors' appointments and take whatever medications and/or exercises to maintain the physical and mental ability to perform satisfactorily in my employment." *Id.*

Just four months later, management received another complaint of inappropriate behavior by Mawson during the administration of an employee test. The company investigated the complaint and, in a letter to Mawson dated September 24, 1994, found Mawson had again made inappropriate comments during testing such as "offering backrubs to relieve 'tension'" and, in addition, had fallen asleep during the afternoon portion of the test. (Def.'s Ex. I; Mason Dep. 340:16–25.) The letter summarized the disciplinary action taken the previous April and Mawson's acknowledgment, at that time, that he would face disciplinary action "including dismissal" should he deviate from U.S. West policies and procedures thereafter. (Ex. I at p. 1.) "Therefore," the letter concluded, "[t]his Written Reminder is to inform you that should you not take corrective action and should there be no improvement with respect to your performance as a member of this staff within established time frames; we will have no choice but to invoke a Committment/Final Warning Meeting (which includes

dismissal for unsatisfactory performance)." (*Id.* at p. 2.) Mawson's signature is affixed to the letter and dated 9/24/91. In response to an EEO questionnaire dated October 1, 1991 and distributed to all corporate EEO employees, Mawson answered "yes" to questions regarding his awareness of inappropriate jokes, stories, pictures or objects told or displayed within his work group or of the existence of any instances of "Sexual Harassment/Discrimination/Unfair treatment." EEO/Affirmative Action Questionnaire (Pl.'s Ex. 14) at 2. Mawson also expressed the view, without elaboration, that "[a]ny coverage [of these issues by EEO] has always been in the form of discipline" or "some form of retaliation." *Id.*

On November 19, 1991, Mawson met with McCeney for a "fitness evaluation" of Mawson's "performance problems and/or behavioral problems [about which] his management team is concerned." These concerns included Mawson's "falling asleep at times when he is testing, forgetting to complete tasks, a decline in work productivity, and making 'off the wall comments' to clients." (McCeney notes, Pl.'s Ex. 11, No. 1445.) After completing a mental status examination during the evaluation, McCeney concluded it was "possible that some of [Mawson's] behaviors in the workplace may be due to the medication for his arthritis." (*Id.*, No. 1443.) McCeney obtained a release from Mawson authorizing him to talk to Dr. Levine, Mawson's psychiatrist.

On December 3, 1991, pursuant to a different release Mawson signed authorizing McCeney to disclose the evaluation results with the U.S. West Management Team (*see* Pl.'s Ex. 11, No. 1468), McCeney told Matamoros that Mawson was taking "a particular medication" for "a chronic medical condition" that could cause drowsiness and/or memory loss, but that Mawson had discontinued that medication and should no longer display those side effects. (*Id.*, No. 1467.) The memorandum specifically stated that "[t]here are no other psychological or medical conditions at this time that should interfere with Bob's ability to perform his job satisfactorily." *Id.*[1]

---

1. Mawson mischaracterizes these documents as a "release to U.S. West of all information from

Dr. Levine" and thus an admission by the Defendant that the company knew Mawson suffered

Mawson underwent surgery for a kidney stone in May 1992. His physician, Dr. Eric Smith, authorized his return to work on June 11, 1992. (Ex. 11, No. 441, 442.) Shortly after his return to work Mawson suffered a heart attack and was absent from work from August 11, 1992 to October 12, 1992. (*Id.,* No. 446–48.) His supervisor, Nancy McKowen, was informed of the reasons for both absences. (*See Id.*) Mawson returned to work half-days from October 12, 1992 to November 1, pursuant to instructions from Dr. Smith. (*Id.,* No. 449.) He returned to full time (four ten-hour days per week) thereafter.

On July 15, 1993, U.S. West's Health Services Center (HSC) received a note from Mawson's psychiatrist, Dr. Fenster, stating it was "necessary that [Mawson] function in a reduced stress environment" and asking that "all necessary steps" be taken to "ensure this alteration in his workplace." (Ex. 11, No. 1197.) The note offered no specific suggestions. Health Services followed up with Dr. Fenster and called a meeting with Mawson, McKowan, an HSC nurse, and a union representative to evaluate the situation and to discuss possible medical restrictions and work stress. (Clinical Notes dated 7/20/93, Ex. 11, No. 1436.) Discussed was the need for an "action plan" for when Mawson "gets in crisis and how he can handle it other than wanting to leave or be angry with others." (*Id.*) The notes stated Mawson's manager had taken him off his job as a data specialist "as he was not performing [his] job" and moved him to the front desk for three months. (*Id.*) After that Mawson was to move to a support position for three months and then to testing for three months, when he would return to his regular job "and be expected to comply and do all job responsibilities." *Id.* The notes make reference to Mawson's "need to continue in therapy and also stay on meds" and Mawson's "agree[ment] to do so." *Id.*

HSC placed a call to Dr. Fenster, who clarified in a follow-up note dated July 22, 1993, that his request "a diminished stress level" was "short term" only and did not "entail long-term plans nor permanent restrictions." On August 3, 1993, Dr. Fenster and D. Maley from HSC discussed the July 20 meeting. HSC Clinical Notes (Pl.'s Ex. 11, at No. 1435). The notes stated Dr. Fenster was "not aware" Mawson hadn't been doing his job, "was comfortable" with the department's plan for training Mawson and "want[ed] no further restrictions." *Id.* Dr. Fenster stated he intended to add a tranquilizer to the Prozac Mawson was taking and agreed to come up with a plan for Mawson to manage stress. *Id.* HSC called Mawson and the notes stated he was "encouraged."

The notes from Dr. Fenster and the July 20 HSC meeting were the subject of a meeting between Mawson and U.S. West management on August 9, 1993. The meeting, also attended by two union representatives, was memorialized in a confidential "Record of Discussion" signed by those present, including Mawson. (Ex. 11, No. 1196.) The "Record of Discussion" culminated in the following "Understanding with Employee: " "Bob's benefit cases are excessive. Bob needs to follow his doctors instructions and to take all medications. Failure to comply with treatment program may result in disciplinary action up to and including dismissal." *Id.*

Shortly after the August 9 meeting, Mawson's request for a transfer was granted and he began working for BRI as a dispatcher in the National Traffic Center. (Mawson Depo. 29:8 – 31:3.) Art Hidalgo hired Mawson for the dispatcher position and remained his supervisor until February 1994, when Hidalgo was assigned to another department at BRI.

When he transferred to BRI, Mawson became responsible for arranging shipments with RoadRunner Trucking (RoadRunner) in Albuquerque, N.M. (Pl.'s Ex. 2 at 2.) This required frequent contact with RoadRunner's

from a chronic psychiatric condition for which he was taking medication that caused drowsiness. The documents, however, establish that the information from Dr. Levine was released to U.S. West Health Services (McCeney) and that the salient issue—Mawson's psychiatric condition—was never disclosed to the U.S. Management Team. Information from Dr. Levine was not made part of Mawson's personnel file and Matamoros's 12/3/91 memorandum denied there was any psychological condition present at the time that interfered with Mawson's ability to perform his job.

account representatives, who were women. Within months, several of these women complained to BRI management that Mawson had asked them for dates and made other inappropriate comments. (Kidd Dep. (Def.'s Ex. J) at 20; Connolly Dep. (Def.'s Ex. K) at 7; Martinez Dep. (Def.'s Ex. L) at 7:12–17.) In particular, Lisa Kidd complained of Mawson's conduct after she rejected overtures he began making around Thanksgiving 1993.

Kidd testified Mawson called her "constantly," "persisting and persisting" in his attentions from Thanksgiving 1993 to February or March 1994. (Kidd Depo. 32:1 – 33:4.) Many of these calls were initially put through to Linda Martinez, BRI's U.S. West representative, on the assumption that they were business related. Martinez estimated that about 30% of Mawson's calls were nonbusiness related, in which he simply asked to speak to "Lisa." (Martinez Dep. 6:13 – 7:11.) Kidd states Mawson sent her flowers on at least four occasions, including a card with a gift of roses in December 1993 that said "Congratulations on your promotion. Love you. From the Teddy Bear." (*Id.* at 30–34.) Kidd testified she had no idea who sent the flowers and was "extremely upset" when she learned they were from Mawson. (*Id.* at 31:21–25.) Mawson also obtained Kidd's home phone number and address and had been known to "just show up in Albuquerque." (*Id.* at 32.) Kidd stated she became "concerned for [her] personal safety" and feared Mawson's actions could jeopardize her job because of the "strict code of ethics ... with in the contract of U.S. West and RoadRunner" specifying "in no uncertain terms" that the development of "personal relationships" between contractor and vendor was prohibited. (*Id.* at 32:4 – 39:12, 23:19 – 24:21.)

For his part, Mawson denies ever making inappropriate comments or overtures to Kidd. (Mawson Affid., Pl.'s Ex. 2 at p. 2.) He claims his calls were either business related or to check on her "status" after she confided in him that she had breast cancer. (*Id.* at 3.) While Mawson originally denied ever calling Kidd at home (Mawson Depo. at 275:4–8), he later admitted that he did "one time in regards to a shipment." (*Id.* at 285:23–25.) And while Mawson acknowledges sending flowers to Kidd, including the "Teddy Bear"

roses, he contends that any time he sent a note or flowers to a RoadRunner employee it was because of a specific appropriate occasion such as promotion or illness. (Pl.'s Ex. 2 at 3.)

While Kidd did not complain immediately to BRI management, she testified she did call Sonja Williams at U.S. West in December 1993 or January 1994 to complain that Mawson had been "calling and calling and harassing" her. (Kidd Dep. at 40:18–23.) She told Williams she didn't "know what to do" or "who to talk to," and asked whether Mawson really "ha[d] all this power that he says he does." *Id.* Hidalgo testified that a BRI employee named Sonia Williams approached him in early 1994 to report that she had overheard a conversation between Mawson and someone at RoadRunner in which Mawson "was ... soliciting a room in Albuquerque for his upcoming visit there." (Hidalgo Dep. (Def.'s Ex. D) at 27:10–16.) Hidalgo relayed this information to BRI area manager Don Carrington, and the two of them then called RoadRunner Vice President of Sales Dennis Byrum. (*Id.* at 33:5–21.)

Byrum testified in his deposition that he spoke briefly with Mawson after receiving the call from Carrington and Hidalgo because he'd received other "complaints [from his] customer service group with the conversations [Mawson had] been having with them" and asked Mawson "to lay off of that and keep it strictly business during the phone conversations." (Byrum Dep. (Def.'s Ex. M) at 10:3–8.) When the objectionable conversations continued, Byrum contacted U.S. West. (*Id.* at 20:22–25.) Byrum stated he was "very reluctant" to do so given his desire to "protect the business relationship between RoadRunner and U.S. West," but things "got to the point to where we had to address the issue." *Id.* Byrum called Hidalgo, going through "the history" of the complaints, "specifically addressing the Lisa Kidd issue," because "Art had no idea of any of this going on." (Byrum Dep. at 12:1–9; Hidalgo Dep. at 33:17–21.) As a result of a follow-up conversation with Byrum, Carrington recommended U.S. West's internal EEO dispute resolution group investigate the allegations. (Carrington Dep. at 4:11–18.)

US West EEO officer Liz Milan was assigned to handle the investigation into allegations made against Mawson by both RoadRunner and BRI. (Milan Depo. (Def.'s Ex. N) at 6–8, 11:1–25.) Pursuant to this charge, Milan asked Byrum at RoadRunner to interview complaining employees at RoadRunner. In addition Milan, together with U.S. West manager Karen Marcum, reviewed documents related to the previous investigations/disciplinary actions taken against Mawson and conducted 31 interviews of their own. (Report of Internal Investigation Requested by Management: Carol Schleuter and Don Carrington (Def.'s Ex. Q) at 2, 7.) Those interviewed included Mawson, four RoadRunner employees, one member of management, and 25 occupational employees of BRI.

Byrum and RoadRunner Director of Risk Management David Varela summarized the interviews of RoadRunner employees in a document dated March 21, 1994. (Def.'s Ex. P.) The RoadRunner document concluded with a statement that it was "[t]he consensus [of those interviewed] that Bob Mawson often behaves in an unprofessional manner; he frequently diminishes his ability to project a professional image for U.S. West, and detracts from the job he's supposed to be doing by trying to use his job to enhance his personal and social relationships." (*Id.* at p. 2.) Milan and Marcum completed their internal investigation in June 1994, summarizing the results in a formal report dated June 15, 1994, as follows:

> The evidence is conclusive that Bob misrepresented his position with a vendor by giving the perception and implication that he had the authority to affect their [sic] work (give or take away U.S. West business) and that Bob asked at least one vendor employee for a sexual favor in exchange for U.S. West Business. Therefore, there has been a violation of the U.S. West Code of Business Ethics and Conduct Policies.

> Three witnesses, one BRI employee and two vendor employees, substantiated that more likely than not Bob asked the vendor, RoadRunner Trucking, to make hotel reservations for him in Albuquerque.

> Despite his denial of asking BRI and vendor employees out on dates, the evidence suggests that Bob repeatedly used his position to make social contacts and to ask for dates.

> There appears to be enough corroborating evidence from witness interviews and by Bob's own admission that he was aware of prior allegations of misconduct to indicate that he has engaged in a pattern of behavior with respect to misrepresenting and using his position for his own self-interest.

(Report of Internal Investigation (Ex. Q) at 8.)

After receiving the report, U.S. West management discussed the possible actions to be taken. (Carrington Depo. (Ex. R) at 16:18 – 17:20.) The final decision to terminate Mawson was made by Schleuter. (Schleuter Depo. (Ex. S) at 5:14–20 (decision was to terminate Mawson for violating Code of Business Ethics and Conduct).) Carrington and Hidalgo communicated the decision at a meeting with Mawson on June 28, 1994. (Carrington Depo. at 22:5–12.) Mawson filed a discrimination charge with the EEOC one week later, claiming his discharge was motivated by disability discrimination in violation of the ADA and that the reason given for his termination was pretextual. In 1996, Mawson filed the instant lawsuit.

Mawson's claims are premised largely on the vague references to office-wide sexual harassment in the November 1991 survey and the conduct of BRI employees and management just before and during the course of the internal investigation in 1994. Specifically, Mawson offers several memoranda he wrote to Hidalgo and Hidalgo's temporary replacement between January 6, 1994 and May 25, 1994, as evidence to support his claims of discrimination and wrongful discharge. (Pl.'s Ex. 8.)

The first memorandum, dated January 6, 1994, informs Hidalgo that several items, including a prescription and a doctor's report Mawson was using as the theme for a planned book, were missing from his desk. (Pl.'s Ex. 8.) The second, dated January 20, 1994, refers explicitly to talk of "erections, group sex, masturbation and the fact that I couldn't handle them, as if I would really want to" and reiterates the request that Hidalgo "talk with those responsible" for the

"inappropriate abusive language in the office" and "get it stopped." *Id.* In the second memorandum, Mawson states such behavior constitutes "sexual harassment" that must stop "[n]ot only for me, but for everyone that is even remotely being treated like this."

In the third memorandum, dated February 3, 1994, Mawson states he was approached by two female employees in the hallway who asked him if he "still was interested in women, or would I be interested in sex with two or more partners at the same time." (Pl.'s Ex. 8.) Mawson reported telling them "no, I am not into kinky situations" and told Hidalgo he didn't "understand why they even approached me about this." Mawson reiterated his request for Hidalgo's help in "bringing this type of behavior to a halt." *Id.* In a fourth memorandum dated February 11, 1994, Mawson complains that "nothing has changed" with respect to the "language and behavior in the office" and states that "now I have employees coming to me saying that their [sic] are employees involved in 'petting' in the office, drugs being brought into the office [and] .... desks are being gone through and change, stamps, candy and other personal belongings are missing." (*Id.*) Mawson wrote a fifth memorandum to Hidalgo on March 3, 1994, complaining of items including a cigarette case, umbrella, coat, computer disks, and a $20 bill being taken from desks in the office and wondering "how secure this place really is." (*Id.*)

On March 18, 1994, Mawson wrote to Hidalgo's replacement and acting manager David Overtone to complain about an angry exchange involving two female employees named "Sonja and Maureen," who Mawson claims had heard about the supposedly confidential investigation from Hidalgo and told Mawson they hoped he "gets what is coming to you." (Pl.'s Ex. 8) According to Mawson, the women's statements were laced with profanities and curses. Mawson told Overtone he wanted "this matter of abusive, harassing language to me, about me, and in front of others stopped and handled." (*Id.*) He also stated he was "going to the union about [it]." (*Id.*) He recounted the incident in a memo to Hidalgo dated March 22, 1994. (*Id.*)

On April 8, 1994, Mawson wrote to Hidalgo about rumors Hidalgo was "out to get" him, and repeated his request that he stop the "unprofessional attitudes and language" of coworkers. At the end of the memo, Mawson stated that "[t]his is a very stressful situation and I have talked with a doctor about it at length." Mawson in fact filed a union grievance on April 30, 1994, alleging his character was being slighted and his credibility jeopardized by Milan having labeled "guilty" of being "sexist and a liar" before allowing him fully to be "heard." (Pl.'s Ex. 9.) For his relief, Mawson asked the company "to stop this harassment as it is detremental [sic] to me as a person." (*Id.*)

On May 13, 1994, Mawson asked Hidalgo to stop the rumors circulating around the office about a relationship between Mawson and BRI employee Terri Farr, and stated his doctors "were concerned about the effects the stress of the rumors were having on my health." [2] (Ex. 8.) Finally, Mawson complained on May 25, 1994 that Hidalgo's investigation into the matters raised was not being kept confidential, stating Hidalgo had "caused a great deal of stress" as a result "along with a depression that my doctor's is [sic] very concerned about." *Id.* "You may as well have told the whole world that I am a rapist on the loose, since that is the way I am being treated," Mawson stated.

Mawson was seen by Dr. Fenster on May 25, 1994, who wrote that Mawson had "demonstrated a resurgence in agitated depressive symptomatology with a controlled potential for anger and rage and a profound subjective depression of mood." (Pl.'s Ex. 9.) Dr. Fenster stated that in his professional opinion, the "proximal precipitating factors [for Mawson's symptomatology] are related to the harassment action that U.S. West has initiated ... and alleged events within the work environment." Dr. Fenster would be "following Mr. Mawson weekly" and would "forward a comprehensive evaluation when [his] ongoing psychological investigation ... permits." (*Id.*) The following day, cardiologist Dr. Thomas Haffey wrote to say Mawson was under his care and that, in his opinion,

---

2. Mawson denies he had romantic relationship with Farr, but admitted he thought about it and shared those thoughts with Farr. (Mawson Depo. at 82:6–13, 83:1–13.)

"extra stress on the job would be detrimental to his health." (*Id.*)

## III. *DISCUSSION.*

The analytical framework pronounced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) guides my consideration of Mawson's claims. *Williams v. Widnall*, 79 F.3d 1003, 1005 & n. 3 (10th Cir.1996) (explaining *McDonnell*'s application in ADA cases), *discussed in Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997). "In the summary judgment context, a plaintiff initially must raise a genuine issue of material fact on each element of the prima facie case, *Morgan*, 108 F.3d at 1323, as modified to relate to differing factual situations." *Id.* (citing *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1174 (10th Cir.1996) and *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995)).

Once plaintiff establishes a prima facie case of discrimination, the burden under *McDonnell* shifts to the defendant to show a legitimate, nondiscriminatory reason for the employment actions being challenged. *Id.* (citing *Randle* at 451) If the defendant does so, then plaintiff assumes the normal burden of showing " 'there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief.' " *Id.* (quoting *Randle*). Pretext may be shown by " 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons.' " *Morgan* at 1323 (citations omitted). " '[M]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.' " *Id.* (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988)).

### A. *BRI's First Motion for Partial Summary Judgment—ADA Claims.*

Plaintiff's first two claims for relief in his Amended Complaint are that BRI discriminated against him in violation of the ADA by failing to provide him with "reasonable accommodations for his disabilities" and by "utiliz[ing] standards, criteria and methods of administration that had the effect of discriminating against [him] on the basis of [his] disability." (Am.Compl. ¶¶ 27, 30, citing § 12112(b)(5)(A) and (b)(3).) In his third claim for relief, Mawson alleges BRI retaliated against him for, among other things, requesting reasonable accommodation.[3] I will consider the discriminatory discharge and retaliation claims separately.

#### 1. *Discriminatory Discharge.*

While Mawson's first and second claims for relief do not on their face seek to hold BRI liable for anything other than failing to reduce his workplace related stress and using standards and criteria—apparently in its disciplinary policies—that had the effect of discriminating against him based on his disabilities, the relief sought (compensation for lost past and future wages and punitive damages) reveals them actually to be claims for discriminatory discharge. Both sides proceed on this assumption and the claims will be analyzed accordingly.

BRI asserts it is entitled to summary judgment on Mawson's first two ADA claims for several reasons, including: (1) Mawson has failed to establish a *prima facie* case of disability discrimination under the ADA; (2) BRI had a legitimate nondiscriminatory reason for terminating Mawson's employment; (3) BRI's standards, criteria and policies are job-related and consistent with business necessity; and (4) Mawson has failed to establish the requisite causal connection between his alleged disabilities and his termination. (Def.'s Br. in Support at 24.)

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability . . . in regard to job application

---

**3.** Mawson also alleges retaliation for reporting sexual harassment and for filing grievances with his union representatives, which claims are addressed in BRI's Second Motion for Partial Summary Judgment and discussed *infra*.

procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.,* § 12111(8); *White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir. 1995).[4]

> To establish a prima facie case under the ADA, a plaintiff must demonstrate: (1) that [he] is a disabled person within the meaning of the ADA [citation omitted]; (2) that [he] is qualified, that is, [he] is able to perform the essential functions of the job, with or without reasonable accommodation [citation omitted]; and (3) that the employer terminated [his] employment under circumstances [that] give rise to an inference that the termination was based on [his] disability [citing *White* at 361].

*Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997). "The final prong of the test requires the plaintiff to present some affirmative evidence that disability was a determining factor in the employer's decision." *Id.* (citing *Ennis v. National Ass'n of Business and Educational Radio, Inc.,* 53 F.3d 55, 59 (4th Cir.1995)). "This burden is 'not onerous,' but it is also 'not empty or perfunctory.'" *Id.* "The plaintiff must present evidence that, if the trier of fact finds it credible, and the employer remains silent, he would be entitled to judgment as a matter of law." *Id.* at 1324.

It is doubtful that the evidence marshaled by Mawson is sufficient to establish a *prima facie* case of disability discrimination. There simply is no affirmative connection, under any reading of the facts, between Mawson's termination and his mental or physical ailments and no inference of such a connection

that can be drawn from the record. Mawson does not allege he was fired "because" of his mental or heart condition or allege that either condition caused him to act in any particular way towards BRI or RoadRunner employees. (Mawson Dep. at p. 75.) Mawson understood he was being terminated for violating company rules and simply disagreed he had done so. (*Id.* at 79–80 ("I never saw any proof that I did anything wrong. There was no evidence, or whatever you want to call it")). Nevertheless, and out of an abundance of caution, I will assume the *prima facie* case for purposes of summary judgment and consider the issue of pretext.

■ BRI's stated justification for terminating Mawson was that Mawson had violated the company's Code of Business Ethics and Conduct in his dealings with RoadRunner employees and had engaged in a pattern of behavior during his tenure with the company of misrepresenting and using his position for his own self-interest. (Ex. Q at 8.) Thus, the question on summary judgment is whether Mawson has established a genuine dispute as to whether this facially nondiscriminatory explanation is credible. I find he has not.

Mawson denies the allegations that precipitated the 1994 investigation and disputes the conclusions reached. Mawson questions the "summary" nature of BRI's disciplinary procedures generally, denies there was any "real" evidence against him and claims U.S. West pressured Lisa Kidd to testify against him. (Pl.'s Ex. 2, ¶ 3–4.) The only affirmative evidence offered to support the claim of pretext is a series of letters of reference and commendation from various U.S. West employees and recruits with whom Mawson had contact in 1990 and 1991 (collected at Pl.'s Ex. 8) and witness statements he provided to support his union grievance in 1994 (collected at Ex. 9). The latest of the reference letters

---

4. BRI asserts the ability to follow company guidelines, rules and instructions and to refrain from contentious arguments and insubordinate conduct is an "essential function" of performing any job. Pointing to admissions Mawson made in his deposition that following work rules, communicating effectively with vendors, projecting a professional image, acting in the company's, rather than his own personal, interest—all requirements articulated in the U.S. West Code of Business Ethics and Conduct—were "essential functions" of Mawson's position as transportation coordinator, BRI concludes Mawson cannot show he was otherwise "qualified" for his position because he "failed ... to adhere to U.S. West's Code of Business Ethics and Conduct." (Def.'s Br. Support First Mot. Partial Summ.J. at p. 30.) I find this argument better suited for a discussion of pretext, and consider it *infra.*

was written in October 1991. The reference letters predate by several years the allegations and the investigation forming the basis for Mawson's termination, and do not constitute "significant probative evidence" of pretext as would defeat a summary judgment motion. The witness statements, containing gems such as "I cannot remember names or pieces of the conversation [overheard between Mawson and a carrier in New Mexico], only that it was very mutual on the socialistic [sic] part of the call I had witnessed" (Ex. 9, p. 2) and "[i]t is my opinion that several members of the NTC staff, including myself, use language that is flirtatious & possible [sic] could be considered provocative by some people" (*id.* p. 3), are not only of dubious probative value but actually support the conclusion reached in the 1994 investigation.

Mawson has failed to create a triable question on the issue of pretext, either by demonstrating weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in BRI's proffered reasons for firing him, or by coming forward with any independent evidence that his heart or mental conditions, rather than the results of the 1994 investigation, actually formed the basis for his termination. Under these circumstances, proceeding to trial would be futile and Defendant's Motion for Summary Judgment on Mawson's disability discrimination claims will be granted.

### 2. Retaliation for Requesting Accommodation.

In his Third Claim for Relief, Mawson claims BRI retaliated against him for requesting reasonable accommodation for his disabilities. Again, even assuming Mawson was a qualified individual and that his request for a reduction in workplace stress levels constitutes a request for accommodation within the meaning of Title II of the ADA, Mawson has failed utterly to present any evidence of a causal connection between the request and his termination. Without facts creating at least an inference that the two were causally related, Mawson cannot establish a *prima facie* case of retaliation under the ADA. *See Morgan,* 108 F.3d at 1324. Because the issue of pretext is also integral to a claim for retaliation under the ADA, Mawson's failure to create genuine dispute as to the trustworthiness of BRI's prof-

fered reasons for firing him provides an independent basis for granting BRI's motion with regard to this claim. *See id.*

### B. BRI's Second Motion for Partial Summary Judgment—Title VII Claims.

In addition to his claims for disability discrimination and retaliation under the ADA, Mawson also asserts claims for sexual harassment and retaliation under Title VII. Mawson claims Defendants' "treatment of [him] in his employment created a hostile work environment" and that he was targeted for retaliation when he complained about it. (Am.Compl.¶ 36.) Defendants move for summary judgment on these claims as well, arguing they claims are outside the scope of the administrative charge Mawson filed with the EEOC and, therefore, that Mawson failed to exhaust his administrative remedies with respect to his Title VII claims.

The filing of an administrative charge with the EEOC and the Colorado Civil Rights Commission is a jurisdictional prerequisite to bringing a civil suit for employment discrimination or retaliation under Title VII. *See Woodman v. Runyon,* 132 F.3d 1330, 1341 (10th Cir.1997). The purpose of the exhaustion requirement is to provide the charged party with notice of the type of discrimination alleged and to give that party and the administrative agencies an opportunity to work on conciliation or voluntary compliance. *Id.* at 1342 (citing *Ingels v. Thiokol Corp.,* 42 F.3d 616, 625 (10th Cir.1994)). Because Mawson's administrative charge contained allegations of disability discrimination only, Defendants claim they did not have notice of any hostile environment or other Title VII claims and were deprived of any meaningful opportunity for conciliation or voluntary compliance.

As a general rule, a plaintiff is not limited in drafting his civil complaint to the specific allegations appearing in the administrative charge. Rather, his complaint " 'may encompass any discrimination like or reasonably related to the allegations in the EEOC charge.' " *Woodman,* 132 F.3d at 1341 (quoting *Brown v. Hartshorne Pub. School Dist. # 1,* 864 F.2d 680, 682 (10th Cir.1988)).

Thus the question here is whether the Title VII claims for hostile environment and retaliation asserted in Mawson's Amended Complaint are "like or reasonably related to" the allegations in his administrative charge.

Mawson filed a charge of discrimination with the EEOC on July 5, 1994, seven days after his dismissal from BRI. (Compl.¶ 23.) In the charge, he checked only the box indicating discrimination because of disability, leaving blank the boxes for discrimination based on sex and retaliation. The factual allegations were:

I. I was hired by the Respondent on or about August 1979. On or about June 28, 1994, I was discharged from my position of Transportation Coordinator.

II. I was told that I was terminated for sexual harassment and for violating the Respondent's Code of Ethics.

III. I believe that I have been discriminated against because of my disability, in violation of Title I of the Americans with Disabilities Act, as amended, for the following reasons:

A. I was never given warnings or disciplinary actions prior to my discharge.

B. My witnesses were intimidated.

C. I do not believe that I would have been terminated were it not for my disability.

Admin. Charge (Def.'s Second Br.Ex. A) (the "Charge").

In an affidavit accompanying the Charge, Mawson elaborated upon these allegations, specifying manic-depressive disorder as his disability, denying the truth of the allegations of sexual harassment BRI made against him, and specifying the manner in which the witnesses willing to testify on his behalf were intimidated. (Def.Ex.A.) Mawson also attached a document entitled "Allegations" to the Charge, originally prepared for a grievance filed with his union, denying each instance of sexual harassment with which he had been accused and explaining the circumstances of each incident. *Id.*

Mawson acknowledges the Charge and its supporting documents contain no specific allegations that he had been the victim of sexual harassment or Title VII retaliation, but asserts such allegations are part and parcel of the denials and explanations he gave to rebut the charges of sexual harassment against him and could "reasonably be expected to grow out of" his own charges of disability discrimination. According to Mawson, his charge of disability discrimination was based on Defendants' failure to discipline his fellow workers and control their "comments overtures, propositions, and foul language" which exacerbated his medical and psychological conditions. (Pl.'s Br. in Response to Def.'s Second Mot., p. 3.) In addition, Mawson asserts he did not fill out the EEOC charge or form affidavit, but only signed the Charge after it had been prepared by the EEOC intake officer. He claims he told the intake officer that he had complained of sexual harassment he observed in the workplace and thought it "odd" that he was accused of sexual harassment after being harassed himself. (Pl.'s Ex. 2 at 7.)

The omission in the Charge of any reference to sex-based discrimination or retaliation does not automatically compel the dismissal of Mawson's Title VII claims. Courts have allowed plaintiffs to pursue claims having a different basis from those alleged under circumstances where the defendant actually received notice of the different claim and there was an opportunity for the EEOC to obtain voluntary compliance, *e.g. Johnson v. N.T.I.*, 898 F.Supp. 762, 767 (D.Colo.1995) (allowing a claim for race discrimination when defendant's counsel had responded to it specifically before the EEOC), or, in the absence of such notice, where there was evidence of a failure on the part of the administrative agency to investigate the charge reasonably. *Hicks v. ABT Assocs.*, 572 F.2d 960, 966 (3rd Cir.1978) (claim allowed when the EEOC investigator failed to contact the plaintiff in violation of its own regulations). Other than vague assertions that he told the intake officer he had been sexually harassed but she failed to include it in the Charge, there is nothing in the record that would entitle Mawson to pursue his Title VII claims under these authorities.

Mawson's Charge is clearly limited to claims of disability discrimination. Both the EEOC's Notice of Charge of Discrimination and BRI's response to the EEOC's Request for Information regarding the Charge are

limited to Mawson's Charge of disability discrimination and demonstrate a lack of notice of any additional Title VII claims. *See* Notice (Def.'s Second Br.Ex. B) and Letter dated 8/8/94 from Milan to Roybal (*Id.* at Ex. C.) The fact that Mawson's circuitous (and failed) theory of relief under the ADA—that Defendants' failure to alleviate his workplace stress by controlling coworkers' hostility towards him exacerbated his medical and psychological disabilities in violation of the ADA—includes allegations of trumped-up sexual harassment charges against Mawson are not probative of allegations that Mawson was discriminated against on the basis of sex and does not notify Defendants or the administrative agency that Mawson intended to pursue Title VII sexual harassment or retaliation claims of his own.

An allegation that plaintiff was falsely accused of conduct which, if true, might have given rise to a claim of employment discrimination based on sex by someone else in no way states a cause of action that plaintiff himself was a victim of discrimination based on his sex. *Balazs v. Liebenthal*, 32 F.3d 151, 155 (4th Cir.1994). While Mawson attempts to characterize his series of complaints regarding the sexually explicit and hostile comments of three female coworkers in the Spring of 1994 as independent indicia of sex-based discrimination/sexual harassment against him, the allegations related exclusively to Mawson's disability claims as having exacerbated his work-related stress and his medical and psychological conditions. Mawson never alleged this "harassment" was based on his sex or that these coworkers had the authority or purported to act or to speak on behalf of the company, essential elements of a Title VII claim for sex discrimination based on hostile environment. *Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 797 (10th Cir.1997) (citations omitted).

Further, Mawson's contention that he told the EEOC intake officer about his earlier complaints of sexual harassment and that she failed to include them in the Charge is insufficient to satisfy the prerequisite of notice either to the agency or to the Defendants. In *McNight v. Dormitory Auth.*, 995 F.Supp. 70, 77 n. 2 (N.D.N.Y.1998), for example, the court did not include as part of the charge allegations contained in a letter plaintiff presented to the state human rights agency intake officer, who allegedly used the letter to draft the charge signed by plaintiff. The court reasoned plaintiff presumably read the charge and concluded even an unrepresented person should have amended the charge to make it accurate before signing it. *Id.* Because the letter offered the employer no opportunity for conciliation as to the different charges, the letter could not be used to establish notice on the part of the employer. *Id.* Mawson had the opportunity to review and amend his Charge and failed to do so. In my view, moreover, the fact the allegations Mawson now argues should have placed Defendants on notice of his Title VII claims were detailed in attachments to a Charge expressly limited to a claim for disability discrimination only underscores Defendants' right to rely on that limitation in preparing for and attempting to conciliate Mawson's claims.

I conclude Mawson's claims of sexual harassment and retaliation for complaining about sexual harassment of himself and others were not reasonably related to the allegations made in his EEOC charge and that Mawson's Title VII claims are therefore barred. In addition, and in an effort to complete the record in the event of an appeal, I also conclude Mawson's Title VII retaliation claim would fail on its merits notwithstanding the jurisdictional flaw because Mawson has failed to come forward with any evidence demonstrating a causal connection between his 1991 or 1994 complaints of sexual harassment and his termination. The establishment of such a connection is a necessary element of a Title VII retaliation claim, *see Berry v. Stevinson Chevrolet*, 74 F.3d 980, 985 (10th Cir.1996), and no it does not exist on the facts of this case.

### IV. *CONCLUSION.*

I conclude Mawson has failed to create a genuine dispute on the question of whether BRI's stated reason for terminating his employment was a pretext for disability discrimination under the ADA and he has failed to establish a causal connection between any protected activity under the ADA or Title VII and the adverse employment action of

**1218**

which he complains. Mawson's Title VII claims of sex discrimination premised on hostile work environment and retaliation theories of relief are jurisdictionally barred because his EEOC Charge failed reasonably to notify either the administrative agency or the Defendants of such claims. For these reasons, Defendants' Motions for Partial Summary Judgment are GRANTED in their entirety and Plaintiff's Amended Complaint is DISMISSED. Judgment shall enter against Plaintiff and in favor of Defendants accordingly.