Larry GRAVES, Plaintiff,

v.

NATIONAL RAILROAD PASSENGER CORPORATION, dba Amtrak, Defendant.

No. 2:97–CV–0084–S.

United States District Court, D. Utah, Central Division.

March 30, 2000.

Richard I. Ashton, Troy K. Walker, Ashton Braunbergr & Boud PC, Sandy, UT, for Plaintiff.

E. Scott Savage, David P. Williams, Casey K. McGarvey, Jonathan I. Saperstein, Berman, Gaufin, Tomisc, Savage & Campbell, Salt Lake City, UT, National Railroad Passenger Corp., Washington, DC, for Defendant.

## MEMORANDUM DECISION

SAM, Senior District Judge.

Before the court are: (1) a motion for summary judgment submitted by defendant National Railroad Passenger Corporation dba Amtrak; (2) a cross-motion for partial summary judgment submitted by plaintiff Larry Graves; and (3) plaintiff's motion to strike points I and II of defendant's supplemental memorandum of law on summary judgment motions. The court, having carefully considered the parties' briefing and oral argument and being fully advised, now enters the following ruling.

## FACTUAL BACKGROUND

Since approximately the early 1980's and "throughout the years", plaintiff has suffered from minor back pain and has seen doctors and chiropractors periodically for treatment and manipulation. Plaintiff was hired by defendant as a locomotive engineer in May 1989.

In June 1990, plaintiff allegedly sustained a back injury while at work which caused him to develop lower back pain. From June 1990 until October 1990, plaintiff was off from work. During that time, he had oral surgery. He also saw two doctors due to pain in his lower back. In October 1990, he was released to return to work as an engineer without restrictions. He was assigned a 350–mile passenger train route between Albuquerque, New Mexico and La Junta, Colorado.

On March 2, 1991, plaintiff sustained another lower back injury while at work, allegedly due to a defective engineer's seat on the train he was operating on his Albuquerque–La Junta route. Following this injury, plaintiff went to a series of doctors about his back pain and remained off duty until April 23, 1991, when he tried working again for about three weeks. Plaintiff continued to see various doctors and finally, upon their advice, went off duty permanently on May 7, 1991.

Plaintiff was referred to an orthopedic surgeon who diagnosed a symptomatic disk herniation and performed a lumbar laminectomy on July 3, 1991. Plaintiff later testified he suffered from severe low back pain in the buttocks and leg pain throughout this period leading up to surgery. The pain was bad both when he remained off from work and during the times he tried to work. The orthopedic surgeon who performed the July 1991 surgery later testified the procedure provided relief from the pain radiating down plaintiff's leg only.

On December 3, 1991, plaintiff's doctor issued his "final report", in which he indicated plaintiff had completed a six-month post-operative rehabilitation, was having only occasional back pain, should lift no more than 30 pounds, and should not sit for prolonged periods. Plaintiff contends these restrictions were not permanent but applied to that point in time only.

On December 10, 1991, plaintiff's attorney in Houston, Texas wrote to ask plaintiff's doctor whether plaintiff was able to return to his previous occupation as a locomotive engineer. Plaintiff's Texas attorney represented that plaintiff's job "required [plaintiff] to sit and run a locomotive between 8 to 12 hours a day. There is constant vibration and motion of the locomotive. There is whole body vibration resulting from the forward and lateral motion of the locomotive." Plaintiff's doctor responded that plaintiff was "unable to return to his previous occupation as a locomotive engineer." Plaintiff contends that, in this response, plaintiff's doctor did not state plaintiff would never be able to return to work as a locomotive engineer.

On January 30, 1992, plaintiff's doctor wrote to the Railroad Retirement Board, representing that plaintiff was "disqualified from work on the railroad," but "can work other jobs with restrictions of lifting no more than 30 pounds and should not sit for prolonged periods of time." Plaintiff contends this letter was his doctor's opinion at that point in time and did not indicate the restrictions were permanent. Moreover, plaintiff denies that his doctor's restrictions disqualify him from working as a locomotive engineer.

In May 1992, plaintiff, represented by his Texas attorney, filed a FELA action against defendant in federal district court in Texas. Plaintiff alleged that, due to defendant's negligence, he had received injuries that were "permanent in nature" in March 1991, due to the defective engineer's seat.

On June 8, 1992, plaintiff's doctor again wrote to the Railroad Retirement Board, stating, with the court's emphasis:

As stated in my communication of 12/17/91, I felt Mr. Graves was unable to return to his occupation of locomotive engineer at that time and is *still disabled* at this point. This comes as a result of a back injury sustained in March 1991 .... It is my opinion that Mr. Graves has been unable to work and *continues to be unable to perform the duties of a locomotive engineer.*

On August 31, 1992, plaintiff's orthopedic surgeon who performed his back surgery acknowledged that plaintiff "is still disabled. I do not anticipate his return to his previous occupation." Plaintiff again contends neither letter indicates he was permanently disabled from returning to work as a locomotive engineer.

On March 17, 1993, a rehabilitative consultant wrote to plaintiff's attorney, stating in part, with the court's emphasis:

*Mr. Graves' work restrictions rule out a return to his job as a locomotive engineer.* He has sustained a loss of labor market access as well as a loss of wage earning capacity as a result of his on the job injury and subsequent spinal fusion. He may also sustain a reduction in work life expectancy, given his multiple problems, including post traumatic stress disorder. Pre-injury Mr. Graves had demonstrated the ability to earn at the pay rate of a locomotive engineer. Post injury he will be limited to entry level unskilled to semi-skilled jobs which pay $4.25 to $7.00 per hour.

Plaintiff argues this is irrelevant, hearsay evidence. On March 18, 1993, plaintiff's orthopedic surgeon issued a report in which he stated plaintiff had "reached maximal medical improvement", and he "would not recommend that [plaintiff] go back to work at the railroad ... and specifically that he ... not be exposed to repetitive bending, stooping, lifting or vibrations." Plaintiff contends the doctor's recommendation is not a prohibition against him returning to work as a locomotive engineer.

Plaintiff's FELA trial began in March 1993. In general, plaintiff's counsel emphasized plaintiff's physical impairments and limitations while defendant's counsel argued plaintiff's condition was due to pre-existing back problems, not from sitting on a purportedly defective engineer's seat in March 1991.

Plaintiff testified that an engineer must remain seated to operate a train safely. He stated that, following the March 1991 accident, his back pain "never fully left", and, although he had good days and bad days, he had never had a pain-free day. He also testified that, since the date he had to leave his job, he had been unable to work any place. He further testified his back kept him from engaging in other activities he had previously enjoyed, such as fishing and tinkering with his truck.

Plaintiff's orthopedic surgeon testified plaintiff is "going to have back trouble for the rest of his life, basically." The doctor did acknowledge, however, that most people with ruptured disks do get better eventually. Plaintiff's doctor testified he would not recommend that plaintiff engage in heavy labor or "go back to a job where he is exposed to repeated vibrations, such as a truck driver or train operator." He stated plaintiff should lift no more than 20–25 pounds and should not have a job that requires stooping or repeated bending. Plaintiff again contends this testimony reveals the doctor's opinion at the time of trial only. At one point, the testimony of plaintiff's doctor went as follows:

Q. And are these limitations permanent?

A. Yes.

Q. And they'll be with him the rest of his life?

A. That's correct.

In view of this testimony, plaintiff admits his doctor testified he would have permanent limitations but denies such limitations would forever prevent him from working as a locomotive engineer.

During the FELA trial, plaintiff offered the expert testimony of an investment banker who calculated plaintiff's future loss of income and benefits, based on the assumption that plaintiff "cannot go back to work as a locomotive engineer." Plaintiff argues this testimony is irrelevant because the jury did not award plaintiff future earnings.

The jury returned a verdict holding defendant liable, in part, for plaintiff's injuries. It awarded plaintiff $88,000, attributable to defendant's negligence but found plaintiff 60 percent contributorily negligent. As a result, judgment was entered for plaintiff for $35,200, excluding costs and interest. No award was made for the loss of future earnings or for future impairments. Defendant satisfied the judgment in full.

A few weeks after the FELA trial, plaintiff asked to return to engine service with defendant. Defendant told plaintiff to forward a complete medical report, including any work restrictions, and a release to return to work. Plaintiff wrote back, confirming his desire to return to work "in any available capacity" and forwarding past medical records. Plaintiff subsequently provided a medical release from his doctor, dated May 27, 1993, stating plaintiff "has reached maximum medical benefit and is able to return to work for whatever lies within his comfort tolerance."

On June 1, 1993, plaintiff completed defendant's "Request for Reasonable Accommodation" form for a reasonable accommodation under the Americans With Disabilities Act ("ADA"). Plaintiff described his disability as "post-op lumbar laminectomy" and explained the accommodation he sought as follows: "Permission to take a[sic] Amtrak physical. Also, to mark up on the engineer's board. Hopefully to return to work." Defendant has not allowed plaintiff to take a physical examination.

On July 15, 1993, the Chairman of defendant's ADA Accommodation Panel advised plaintiff it had reviewed his "Request for Reasonable Accommodation" form and concluded as follows:

> Based on your medical records it appears that you are medically disqualified from performing the duties of a locomotive engineer. Given your statements, and those of your doctors regarding your inability to perform the essential functions of an engineer position, we do not believe that an accommodation can be made in your case.

The letter offered to attempt to locate a vacant position for which plaintiff had the requisite skills. On July 29, 1993, defendant again wrote plaintiff, enclosing a transfer request form to complete if plaintiff were interested in positions other than engineer. However, the letter indicated the positions most likely to become available, clerk or baggageman, were covered by a different collective bargaining agreement, such that plaintiff's engineer seniority would not be transferable. On August 2, 1993, defendant sent plaintiff a listing of jobs for which defendant was then recruiting, their locations and pay rates.

Defendant received a "Second Opinion" report by a new doctor, Dr. Mathis, dated October 18, 1993, stating that plaintiff "desires to return to his previous occupation as a railroad engineer." Although this doctor stated plaintiff "could physically sit in the train and perform his duties as he had previously," he, nevertheless, warned that "the prolonged sitting and repetitive vibration make it likely that he will have back problems in the future."

On November 17, 1993, plaintiff wrote to defendant requesting "the opportunity to resume my position as an Amtrak Engineer," and requesting "reasonable accommodations" under the ADA. Plaintiff never suggested or explained what those accommodations might be. On January 10, 1994, defendant responded, denying plaintiff's request to return to his position for the reasons outlined in its July 15, 1993 response.

On January 18, 1994, plaintiff filed a Charge of Discrimination under the ADA with the Equal Employment Opportunity Commission (EEOC) as follows:

> On March 2, 1991, I sustained an on-the-job injury. On May 23, 1993, I was released by my doctor to return to work. On several occasions, the latest being November 17, 1993, the company has refused to return me to work in my position as Locomotive Engineer and provide me with reasonable accommodation.

On June 28, 1994, plaintiff was examined by Dr. Thomas Miller who concluded plaintiff could return to work as a locomotive engineer. On July 19, 1994, Dr. Miller informed plaintiff's union that plaintiff could return to his position without restrictions. Dr. Miller also so informed defendant's Senior Human Resources Representative on September 26, 1994. Responding to an EEOC request on October 3, 1995, Dr. Miller again confirmed his opinion that plaintiff could return to work as a locomotive engineer without restrictions.

On April 22, 1996, the EEOC issued a determination letter in which it noted:

> The evidence reflects [plaintiff] was injured with an extensive recovery period required. [Plaintiff] thereafter requested reinstatement to his former position. [Defendant] refused to reinstate [plaintiff] because there had been previous testimony in a law suit brought by [plaintiff] that he was permanently disabled and because of the doctrine of judicial estoppel. [Defendant] made no effort to determine if, at the time [plaintiff] applied for reinstatement, he was able to perform the essential functions of the locomotive engineer position with or without an accommodation. Additionally, the doctrine of judicial estoppel relied upon by [defendant] is not a valid defense in regard to this charge.

Defendant claims this letter is not probative or admissible evidence before this court.

At Dr. Miller's request, plaintiff was examined by Dr. Mark Scott, a specialist in physical medicine and rehabilitation. Dr. Scott ordered plaintiff to undergo a functional capacity evaluation on December 18, 1997. As a result of his examination of plaintiff, plaintiff's functional capacity evaluation, and a review of the performance standards for a locomotive engineer, Dr. Scott concluded plaintiff meets or exceeds all the demands to perform the duties of a locomotive engineer.

It is undisputed that, according to defendant's "Agreement Standards and Qualifications" for engineers, locomotive engineers are "[r]esponsible for safe operation of electric, diesel-electric, and turbo-electric locomotives." Working unsupervised, an engineer must make "timely and critical decisions concerning the safe movement of the train." Engineers, among other requirements, must inspect locomotives to insure safe service; must perform air brake tests on the locomotive; must control the throttle, air brakes, horn and other switches and controls; and must adhere to and comply with train and bulletin orders, wayside signals, operating rules, special instructions and federal, state, and local regulations related to transporting passengers and equipment safely and effectively. Engineers must work any time, day or night, indoors and outdoors, in alternating shifts and in all weather condi-

tions. They must work in the presence of moving equipment and noise generated by equipment. Plaintiff contends there is no evidence indicating he cannot perform these duties.

The job ability requirements for an engineer include, among other things, lifting objects weighing 30 pounds on a single lift and repeatedly on the average of 15 times per day; pushing repetitively more than 20 pounds for 5 minutes daily; pulling repetitively more than 20 pounds for 5 minutes daily; working at heights or on a ladder 5 percent of the time; frequently bending the back for 15 minutes per day or the knees for 5 minutes per hour; climbing a height of 8 feet; moving over rough surfaces, like ballast; maneuvering through small spaces; coping with work pressures such as schedule adherence, equipment problems and emergencies; and working unassisted or unsupervised. Plaintiff again asserts there is no evidence that he cannot perform these functions. Plaintiff testified an engineer has to sit in the engineer's seat and keep a vigilant lookout throughout the course of his assigned route.

The EEOC issued a right to sue letter on November 7, 1996. Plaintiff filed the instant suit on February 4, 1997, alleging discrimination under the ADA. In its answer, defendant admitted it perceived plaintiff to be unable to return to the position of locomotive engineer and has refused to re-employ him in that position based upon that perception.

Defendant subsequently moved for summary judgment, arguing plaintiff's suit must be dismissed on the basis of: (1) judicial estoppel, or (2) plaintiff's failure to make out a prima facie ADA claim. Plaintiff responded with a cross-motion for par-

tial summary judgment, arguing that, because he has established a prima facie ADA claim as a matter of law, the only issue remaining for trial is the amount of damages.

Having carefully considered the parties' briefing, the court ruled from the bench, prior to oral argument on these motions, that it found merit in neither defendant's theory of judicial estoppel nor in plaintiff's theories of collateral estoppel and res judicata. Accordingly, the focus of the hearing was limited to whether plaintiff could establish a prima facie ADA claim.

At the conclusion of the hearing, the court requested supplemental briefing from both parties, explaining the impact of evidence dated after November 1993. The parties complied, followed by plaintiff's motion to strike portions of defendant's supplemental memorandum. The parties further submitted a number of letters to the court clarifying their positions.

## SUMMARY JUDGMENT STANDARDS

When summary judgment is sought, the movant bears the initial responsibility of informing the court of the basis for his motion and identifying those portions of the record and affidavits, if any, he believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In a case where a party moves for summary judgment on an issue on which he would not bear the burden of persuasion at trial, his initial burden of production may be satisfied by showing the court there is an absence of evidence in the record to support the nonmovant's case.[1] *See id.* "[T]here can be no issue as to any material

---

1. In his dissent in *Celotex,* Justice Brennan discussed the mechanics for discharging the initial burden of production when the moving party seeks summary judgment on the ground

the nonmoving party—who will bear the burden of persuasion at trial—has no evidence:

Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient. Such a "burden" of production is no

fact ... [when] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*

Once the moving party has met this initial burden of production, the burden shifts to the nonmoving party to designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

> If the defendant in a run-of-the-mill civil case moves for summary judgment ... based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict ....

*Anderson v. Liberty Lobby,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* If the nonmoving party cannot muster sufficient evidence to make out a triable issue of fact on his claim, a trial would be useless, and

the moving party is entitled to summary judgment as a matter of law. *See id.*

## DISCUSSION

### I. *The Motions for Summary Judgment*

Both motions for summary judgment are based upon whether plaintiff has established sufficient evidence to support each element of a prima facie ADA claim.

### A. *Prima Facie ADA Case*

The ADA provides that no employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (1995).

To prevail on an ADA claim, plaintiff generally must establish: (1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, i.e., with or without reasonable accommodation, he is still able to perform the essential functions of his job; and (3) that his employer fired him because of his disability. *See Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997); *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1123 (10th Cir.1995).

At the heart of the pending motions is whether plaintiff has raised at least a genuine issue of material fact as to each element of a prima facie case under the ADA

burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment. Rather, as the Court confirms, a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories and other exchanges between the parties that are in the record. Either way, however, the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party.

*Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (citations omitted).

sufficient to withstand summary judgment. Of particular significance are the first two elements.

## B. *Disability Pursuant to the ADA*

■■ Under the ADA, "'[t]he term "disability" means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.'" *Milton,* 53 F.3d at 1123 (quoting 42 U.S.C. § 12102(2)). The ADA does not define "major life activities" but adopts the definition in the Rehabilitation Act regulations. *See Bolton v. Scrivner, Inc.,* 36 F.3d 939, 942 (10th Cir.1994), *cert. denied,* 513 U.S. 1152, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995). There, the term means "'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and *working.*'" *Id.* (quoting 29 C.F.R. § 1630.2(i)) (emphasis added). To establish "that an impairment 'substantially limits' the major life activity of working, an individual must show 'significant[] restrict[ion] in the ability to perform either *a class of jobs or a broad range of jobs in various classes* as compared to the average person having comparable training, skills and abilities.'" *Id.* (quoting 29 C.F.R. § 1630.2(j)(3)(i)) (emphasis added). Plaintiff's inability to "'perform a *single, particular job* does not constitute a substantial limitation in the major life activity of working.'" *Id.* (emphasis added). Thus, if an employer perceives an employee's impairment as limiting his ability to perform one job only, the employee is not disabled for ADA purposes. *See id.; accord Welsh v. City of Tulsa,* 977 F.2d 1415, 1419 (10th Cir.1992). Moreover, the inability to work at the job of one's choice is insufficient to establish disability under the ADA. *See Bolton,* 36 F.3d at 942.

Plaintiff asserts he is "disabled" not because he is physically impaired but because defendant regards him as disabled. Plaintiff contends defendant's briefing reveals its perception that plaintiff: cannot sit for prolonged periods; is unable to lift more than 20–30 pounds; is unable to perform repetitive bending, stooping, or lifting; cannot be exposed to vibration; and cannot engage in heavy labor. Plaintiff further points to affidavits from Kathy M.T. Orr, a certified employment counselor, and Dr. Mark Scott, a specialist in physical medicine and rehabilitation. Both affidavits state that, were plaintiff so restricted, his employment opportunities in many different fields would be diminished substantially. Additionally, plaintiff argues that the position of locomotive engineer is actually a class of jobs, rather than a single position, pursuant to the ADA. The court finds no merit in plaintiff's view.

■■ The court agrees with defendant that, in light of plaintiff's past medical and FELA litigation testimony and records, defendant does indeed find plaintiff disqualified—but from one particular job only, that of locomotive engineer.[2] Defendant further states, and the record reveals, that, consistent with this view, it has offered, more than once, to assist plaintiff in securing *any* other position in its employ for which plaintiff is qualified, regardless of its physical demands; it has never screened or limited in any way defendant's

---

2. *See, e.g., Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 905 (10th Cir.1997), *aff'd,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (dismissal of airline pilots' ADA claim affirmed because plaintiffs failed to prove disqualification from a class of jobs); *MacDonald v. Delta Air Lines,* 94 F.3d 1437, 1445 (10th Cir.1996) ("[T]axiing aircraft is neither a class of jobs, nor a broad range of jobs in various classes, but is instead a single particular job."); *Welsh,* 977 F.2d at 1416–20 (a firefighter is not a class of jobs); *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1120 (5th Cir.1998) (a flight attendant is a single job, not a class of jobs).

alternative employment opportunities within the railroad based on sitting, lifting, bending, or vibration restrictions. *See* Defendant's Exhibits 27, 28, 29, and 32. Defendant, thus, contends, and the court agrees, that it has never treated plaintiff as if it perceives him to have such physical limitations as plaintiff describes above. Rather, defendant correctly points out that, despite its offers of assistance, plaintiff has consistently sought reinstatement to the particular job of his choice only—a locomotive engineer position. Accordingly, the court concludes plaintiff has raised no genuine issue of material fact as to this element sufficient to withstand summary judgment.

### C.   *Qualification Pursuant to the ADA*

■   To seek ADA protection, plaintiff must establish that he is a "qualified individual with a disability." 42 U.S.C. §§ 12111(8), 12112(a). This inquiry has two steps:

> First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if ... we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

*White v. York Int'l Corp.*, 45 F.3d 357, 361–62 (10th Cir.1995); *accord Milton*, 53 F.3d at 1123.

■   Defendant contends plaintiff could not perform the duties required of a locomotive engineer at the time he made his ADA requests in 1993. In the record of the FELA trial, defendant points to plaintiff's medical history, his sworn testimony, and expert testimony from his treating physicians which concludes that, because working as a locomotive engineer would only aggravate his back problems, plaintiff would never be able to return to this position. Additionally, during oral argument, defendant specifically focused upon documented medical evidence from January 1992 through October 1993 (described in detail above under "Factual Background"), illustrating plaintiff's physical limitations and inability to resume his engineer position due to back problems.

Plaintiff responds that a May 1993 "work release" from Dr. Sanders and a "second opinion" from Dr. Mathis in October 1993 are sufficient to establish that he was qualified in 1993 to return to work in his past position. This argument is belied by the evidence itself. The May 1993 release states only that plaintiff may "return to work for whatever lies within his comfort tolerance." It does not specify that plaintiff is qualified to return to work as a locomotive engineer. Even in the "second opinion", the doctor indicated "the prolonged sitting and repetitive vibration make it likely that he will have back problems in the future." The court is of the opinion that these documents, considered together or separately, do not present an unqualified release to return to work as a locomotive engineer. The court, thus, concludes plaintiff has failed to present evidence sufficient to establish he was actually qualified to perform the essential functions of a locomotive engineer at the time he submitted ADA requests to defendant.

Relative to the issue of reasonable accommodation, the court notes that when plaintiff completed defendant's Request for Reasonable Accommodation form in June 1993, he stated the accommodation he sought was permission to take a physical and to "mark up on the engineer's board" in hopes of returning to work. Such a response failed to address what accommodations plaintiff expected defendant to make on his behalf to enable him to return to an engineer's position, given his past

medical and legal history. In November 1993, when plaintiff again asked to return to his engineer position, he requested "reasonable accommodations" under the ADA but never explained what those accommodations might be.[3] Although defendant twice denied plaintiff's requests to return to work as a locomotive engineer, defendant did attempt to reasonably accommodate plaintiff by offering assistance in locating alternative positions with defendant. Plaintiff has simply continued to insist that he be reinstated to a locomotive engineer position. The court, therefore, concludes that, at the time plaintiff submitted his ADA requests to defendant, he was not qualified to perform the essential functions of a locomotive engineer, with or without reasonable accommodation.

### D. The Impact of Post–1993 Evidence

By January 1994, plaintiff had filed his ADA charge with the EEOC. At that time, there was no evidence that plaintiff was qualified for the position of locomotive engineer, and defendant refused to permit him to take a physical examination for that position. During the course of the EEOC investigation and after, however, plaintiff saw two doctors, Dr. Miller, in June 1994, and Dr. Scott, in December 1997. The record reveals that both doctors examined plaintiff and found him fit to perform the duties of a locomotive engineer. Plaintiff also has submitted additional documents addressing his physical abilities after 1993. The court requested, and the parties submitted, supplemental briefing on the effect of this later evidence of plaintiff's physical condition.

■ Plaintiff basically takes the position that defendant's ADA violations have been continuing despite his hundreds of requests to return to work. He argues the

ADA does not require him to keep submitting new requests for reasonable accommodation when defendant is "engag[ing] in a continuous pattern of discrimination" by denying him an opportunity to return to his engineer position, based upon the principle of judicial estoppel. Again, the court is not persuaded by plaintiff's argument.

As defendant points out, plaintiff submitted only two specific, written requests for reasonable accommodation, pursuant to the ADA, which defendant denied based upon medical evidence then available. When plaintiff filed his charge with the EEOC, he referred to defendant's two denials, stated November 1993 was the date of discrimination, and did not specify that he claimed defendant's purported discrimination was "continuing action". Plaintiff never filed an EEOC charge addressing alleged ADA violations in 1994 or after, he never amended his original EEOC charge to include later alleged ADA violations, and Dr. Miller's letter to defendant of September 1994, advising defendant of plaintiff's physical abilities, did not reference a new ADA request.

Defendant also notes ambiguity, rather than clear notice, in plaintiff's submissions. Initially, plaintiff's two ADA requests for reasonable accommodation were submitted and denied by defendant. Then, several months later, plaintiff provided new medical information from Dr. Miller and Dr. Scott which does not indicate it supports an ADA claim. At the same time, a labor grievance was being processed on plaintiff's behalf through his union, the Brotherhood of Locomotive Engineers. See Defendant's Exhibit 37. Under Rule 25 of the union's collective bargaining agreement, plaintiff is entitled to submit a fitness opinion from his doctor and then request a physical examination to determine if he is fit for work. There is no evidence

---

**3.** See, e.g., Woodman v. Runyon, 132 F.3d 1330, 1344 (10th Cir.1997) (An ADA plaintiff must "suggest the existence of a plausible accommodation, the costs of which, facially do not clearly exceed its benefits."); accord White, 45 F.3d at 360–63.

indicating the medical information from Dr. Miller and Dr. Scott was intended to support anything other than plaintiff's rights under the collective bargaining agreement.

■ Under these circumstances, the court agrees with defendant that plaintiff's ADA claim concerns only his two 1993 requests for accommodation and defendant's denials in July 1993 and January 1994. Plaintiff cannot now be heard to argue that his 1993 requests for ADA reasonable accommodation provided defendant with proper notice of alleged ongoing discrimination. Defendant is entitled to fair and clear notice of an ADA claim. *See Ingels v. Thiokol Corp.*, 42 F.3d 616, 625(10th Cir.1994). Post–1993 evidence is, thus, plainly irrelevant to plaintiff's 1993 ADA claim as it fails to address plaintiff's physical condition in 1993 and whether plaintiff was qualified to resume his engineer position at the time he submitted his ADA requests to defendant. *See, e.g., Penny v. UPS*, 128 F.3d 408, 416 (6th Cir.1997) (medical evidence of plaintiff's condition after the time relative to his ADA claim is legally irrelevant).

## II. *Plaintiff's Motion to Strike*

Plaintiff moves to strike certain portions of Defendant's Supplemental Memorandum of Law on Summary Judgment Motions, arguing they are not responsive to the court's request for supplemental briefing. Further, in response to defendant's letter advising the court of current case law, plaintiff requests the court to return defendant's letter, arguing it fails to comply with the rule for submission of supplemental authority.

The court has given defendant's submissions what consideration is appropriate under the rules of federal procedure and practice. Accordingly, plaintiff's motion to strike is hereby DENIED.

## CONCLUSION

In sum, the court concludes plaintiff has failed to set forth evidence sufficient for a fair-minded jury to find in his favor and cannot demonstrate that genuine issues of material fact remain concerning his ADA claim. Accordingly, defendant's motion for summary judgment is hereby GRANTED, and plaintiff's cross-motion for summary judgment is DENIED.